No. 101,222

STATE OF KANSAS, *Appellee*, v. CHARLES BRIDGES, *Appellant*.

(306 P.3d 244)

990

Opinion filed August 9, 2013.

*Heather Cessna,* of Kansas Appellate Defender Office, argued the cause, and *Carl Folsom, III,* of the same office, was with her on the briefs for appellant.

*Sheryl Lidtke,* chief deputy district attorney, argued the cause, and *Robbin L. Wasson,* assistant district attorney, *Jerome Gorman,* district attorney, and *Steve Six,* attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

NUSS, C.J.: We granted Charles Bridges' petition for review of the Court of Appeals decision affirming his conviction and sentence for second-degree unintentional murder. The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in refusing to admit Bridges' expert witness testimony and thereby deny him his right to present his theory of defense? No.
2. Did the district court err in denying Bridges' motion to suppress his statements to investigators? No.
3. Did the district court err in allowing the State's witnesses to comment on Bridges' credibility? Not preserved for appeal.
4. Did the prosecutor commit misconduct by offering his opinion on Bridges' credibility? Yes, but harmless error.
5. Did cumulative error deny Bridges a fair trial? No.
6. Does the identical offense sentencing doctrine require reversing and remanding for resentencing? No.
7. Did the district court err in applying the BIDS application fee? No.

We therefore affirm the district court and the Court of Appeals panel.

## FACTS

On the evening of July 15, 2004, Bridges personally replaced his home's water heater. When Bridges left for work the next morning his fiance, Laura McCurley, stayed behind to continue her recuperation from recent surgery. At approximately 11:30 a.m., Bridges' home exploded, and McCurley was severely injured. She died from her injuries 11 days later.

Investigators determined that a valve on an uncapped natural gas pipe in the basement had been left in the "on" position. The open valve allowed natural gas to escape, fill the house, and then explode when McCurley lit a cigarette.

During different interviews with various investigators, Bridges gave varying and inconsistent explanations for the cause of the explosion. He eventually stated that before he left for work he checked the pipes due to a gas smell and instead of turning the valve off, he probably, by mistake, turned it on.

At the time of the explosion, Bridges' home was in foreclosure and he was pursuing his second bankruptcy. So the police theorized that he intentionally tried to set a fire to obtain insurance policy proceeds, and McCurley simply had been killed in the process. Bridges was ultimately charged with and convicted of unintentional reckless second-degree murder. This offense is a severity level 2 person felony, and the district court sentenced Bridges to 117 months' incarceration. See K.S.A. 21-3402(b).

The Court of Appeals panel affirmed in *State v. Bridges*, No. 101,222, 2010 WL 1610393 (Kan. App. 2010) (unpublished opinion), and we granted Bridges' petition for review under K.S.A. 20-3018.

Additional facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1: *The granting of the State's motions in limine did not infringe on Bridges' right to present his theory of defense.*

Bridges argues the district court erroneously granted the State's motions in limine to exclude his evidence relating to (1) his depression and (2) the amount of the insurance proceeds he actually received. Bridges contends that the depression evidence via the testimony of psychologist Janice Scott was relevant for two reasons. First, it would show that he only acted negligently, not recklessly, when he installed the water heater. Second, it would explain the inconsistent statements he gave to investigating officials.

Bridges also contends evidence of the insurance proceeds he actually received was relevant to rebut the State's evidence that his house and personal effects were insured for $183,000, which was introduced to argue that his financial gain was a motive. By showing that most of Bridges' insurance proceeds went to his mortgage lender, he wanted to demonstrate financial gain was not a motive because he did not profit from the explosion.

As discussed below, the Court of Appeals panel affirmed the district court on both evidentiary issues. The State obviously agrees with these determinations.

*Standard of Review*

A decision on a motion in limine involves a two-pronged test. The court must determine whether: (1) the material or evidence in question will be inadmissible at trial; and (2) the pretrial ruling is justified as opposed to ruling during trial because the mere offer or mention of the evidence during trial may cause unfair prejudice, confuse the issues, or mislead the jury; the consideration of the issue during trial might unduly interrupt and delay the trial and inconvenience the jury; or a ruling in advance of trial may limit issues and save the parties time, effort, and cost in trial preparation. *State v. Shadden*, 290 Kan. 803, 816, 235 P.3d 436 (2010). Bridges challenges only the first prong, *i.e.*, whether the evidence is admissible.

We begin by recognizing that when this court reviews a district court decision to admit or exclude evidence, we use a multistep analysis. *Shadden*, 290 Kan. at 817. For the first step, we determine whether the evidence is relevant. Evidence is relevant when it has "any tendency in reason to prove any material fact." K.S.A. 60-

401(b). Accordingly, relevant evidence must be both probative and material. *State v. Martinez*, 290 Kan. 992, 1009, 236 P.3d 481 (2010) (citing *State v. Dixon*, 289 Kan. 46, 69, 209 P.3d 675 [2009]). Whether evidence is probative is reviewed under an abuse of discretion standard; materiality is judged under a de novo standard. *Shadden*, 290 Kan. at 817 (citing *State v. Reid*, 286 Kan. 494, 507-09, 186 P.3d 713 [2008]).

For the second step, we determine which rules of evidence or other legal principles apply. The district court's conclusion is reviewed de novo. *Shadden*, 290 Kan. at 817. For the third step, the district court must apply the applicable rule or principle. This application is reviewed either for abuse of discretion or de novo, depending on the rule or principle being applied. 290 Kan. at 817. Some rules and principles grant the district court discretion, while others raise matters of law. 290 Kan. at 817. Here, we are asked to review the exclusion of Bridges' expert testimony, which is generally reviewed for abuse of discretion. 290 Kan. at 819. We review the insurance proceeds exclusion for probativity, *i.e.*, for abuse of discretion. See *Reid*, 286 Kan. at 507-09.

To the extent the district court's evidentiary exclusion infringed upon a defendant's constitutional right to present his or her theory of defense—as Bridges alleges—we exercise de novo review. See *State v. Pennington*, 281 Kan. 426, 433, 132 P.3d 902 (2006). We acknowledge that " '[t]he exclusion of evidence that forms an integral part of the defendant's theory of the case violates the defendant's right to a fair trial.' " *State v. Gaona*, 293 Kan. 930, 953, 270 P.3d 1165 (2012) (quoting *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 [2003]; see *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 [1973]). But we also recognize that the defendant's " 'right to present a defense is subject to the rules of evidence and caselaw on the subject.' " 293 Kan. at 953.

### Evidence Related to Depression

The district court and the Court of Appeals panel both analyzed Bridges' proposed expert witness testimony of psychologist Scott under K.S.A. 22-3220 and K.S.A. 22-3219(1). They concluded the testimony involved a "mental disease or defect" offered to deter-

mine Bridges' ability to form the requisite *mens rea* for the offense. The panel affirmed the district court decision to exclude the evidence because, among other things, Bridges failed to comply with the notice requirement of K.S.A. 22-3219.

The panel also noted the district court's exclusion on the additional basis that "the late identification of the witness violated the district court's discovery order." *Bridges*, 2010 WL 1610393, at *1. The panel only indirectly addressed this basis when it held no good cause existed under K.S.A. 22-3220 to excuse the lack of timely statutory notice and to allow the admission of Scott's testimony.

We start with this latter holding of untimeliness. At the hearing on the State's motion in limine, Bridges' counsel acknowledged that Scott's name had not appeared on the witness list she earlier provided to the State per the "Order for Agreed to Reciprocal Discovery" dated July 16, 2007. That order, which is in the record on appeal, states the following relevant agreement by Bridges:

"[T]he defendant agrees to provide the State with a written list, at least 10 days prior to jury trial, of prospective witnesses intended to be called by the Defendant in jury trial. The list shall include the name, address, date of birth and any other identifying data which would be required for the State to locate the witnesses."

The order, signed by both counsel and the court, then mandates that "the defendant *will* provide to the State a written list, at least 10 days prior to jury trial, of prospective witnesses intended to be called by the Defendant in jury trial as described here-in-above." (Emphasis added.)

Consequently, the State objected to Scott as untimely identified. Bridges' counsel explained she had been unable to locate a Dr. Haines regarding Bridges' mental condition. So she requested Scott be allowed to testify that around the time Bridges' home exploded he was diagnosed with major depression. Bridges' counsel conceded she did not know whether Scott was a doctor of psychology. She also conceded that Scott did not have any memory of treating Bridges, was unable to locate her notes and records regarding his treatment, and did not create a report. According to counsel, the only documentation regarding Scott's consultation was a bill and a diagnostic sheet with a check mark indicating that Bridges suffered from a major depressive disorder at the time.

In holding the witness identification endorsement of Scott was untimely and excluding her testimony, the district court noted the quid pro quo concept contained in reciprocal discovery. It further observed the State's need to contact Bridges' proposed witnesses to discover their proposed testimony before trial. The court also noted that the identification of Scott was made on Thursday (March 20, 2008) before the trial was to start the following week.

Whether untimely submitted evidence will nevertheless be admitted is generally subject to the district court's discretion. See *Gaona*, 293 Kan. at 953 ("Unless a defendant's due process rights are implicated, a district court's exclusion of evidence as a permitted sanction because of a party's failure to comply with discovery under K.S.A. 22-3212[g] will be reviewed on appeal for an abuse of discretion.").

*Gaona* is instructive. There, as here, the parties each requested discovery from the other well before trial. Per K.S.A. 22-3212, the State requested medical records which the defendant intended to produce at trial. But defendant produced no records until approximately 2 hours before he sought to introduce them at trial. We affirmed the trial court's exclusion of the records, holding that among its "multiple sound legal reasons" were "the sanctions available to the district judge for Gaona's violation of reciprocal discovery included exclusion" under K.S.A. 22-3212(g). 293 Kan. at 954. We also held that Gaona's due process right to present a defense was not implicated, as he was free to present his own testimony about the medical problem contained in the records, with corroboration of its existence from his wife.

Similarly, Bridges was free to present his own testimony on this particular issue. Although he chose not to take the stand to testify about his alleged depression, we agree with the district court that its ruling did not prevent his theory of defense, *i.e.*, mistake, from being presented to the jury. The jury heard various recordings of his interviews in which Bridges stated that he had "been under stress" and had problems "for the last 10 years." He also explained his behavior by saying that he did not know why he had turned the valve to open and that he never intended to hurt McCurley. In

addition, Bridges' counsel emphasized in closing argument that Bridges' opening of the valve was a mistake.

As in *Gaona*, we hold the district court did not abuse its discretion in rejecting Scott's proffered testimony as violating the court's discovery order. See 293 Kan. at 954; accord *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (judicial discretion is abused if judicial action is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court).

Even if we agreed the district court had abused its discretion in excluding the evidence because of untimely identification or it appeared to infringe on Bridges' constitutional right to present his theory of defense, we agree with the State's additional position at the district court and on appeal: on the merits, Scott's testimony was irrelevant, *e.g.*, not probative. See *Gaona*, 293 Kan. at 954 (multiple sound legal reasons for the district judge's decision to exclude evidence). Probativity is judged under an abuse of discretion standard. *Reid*, 286 Kan. at 507-09.

As mentioned, evidence must be both probative and material to be relevant. *Martinez*, 290 Kan. at 1009. Material evidence tends to establish a fact that is at issue and significant under the substantive law of the case. *Reid*, 286 Kan. at 505. On the other hand, probative evidence only requires a logical connection between the asserted facts and the inferences they are intended to establish. *State v. Richmond*, 289 Kan. 419, 437, 212 P.3d 165 (2009).

Perhaps because Scott did not have any memory of treating Bridges, was unable to locate her notes and records regarding his treatment, did not create a report, and had only a bill and a diagnostic sheet with a check mark indicating that Bridges suffered from a major depressive disorder at the time to document her consultation, Scott would only generally testify about the symptoms of a major depressive disorder. Bridges' counsel agreed with the district court's assessment of the matter:

"You want to present the psychologist to basically indicate what in general a major depressive disorder consists of, but not make any specific reference to the defendant's situation because we don't have any notes or any recollection as to the situation."

As the State points out, this is a concession by the defense that Bridges' expert witness would not provide any nexus between Bridges' depression and his conduct. We agree with the State that without this nexus, Scott's proffered testimony simply is not probative of Bridges' behavior during the explosion and its aftermath. In short, it is not probative of his contention that he acted negligently, not recklessly, when installing the water heater. Nor is the testimony probative of his explanation about his inconsistent statements to investigating officials.

The Court of Appeals decision in *State v. Edwards*, 48 Kan. App. 2d 383, 408-10, 290 P.3d 661 (2012), is instructive. There, the panel held that expert testimony solely about defendant's mental illness was not probative to show his involuntary ingestion of Haldol affected his mental state the day of the crime to support his claim of involuntary intoxication. Rather, additional testimony was required to show that his mental illness made him particularly susceptible to suffering from akathasia—an inner restlessness leading to confusion, aggression, and increase in homicidal or suicidal behavior—as a result of ingesting Haldol. This additional testimony was needed because akathasia as a side effect of Haldol is extremely rare in the general population. See 48 Kan. App. 2d at 408-10; *cf. State v. White*, 279 Kan. 326, 341, 109 P.3d 1199 (2005) (An expert was prepared to testify that defendant "had a mental disease or defect [depression], that people with this disease or defect can lack the ability to premeditate and to form intent, *and that his conduct on the date of shooting was consistent with somebody acting under that disease or defect*." [Emphasis added.] Accordingly, district court erroneously excluded expert's testimony under K.S.A. 22-3220.).

### Evidence of Insurance Proceeds

The district court also excluded evidence of the insurance proceeds Bridges actually received. The court reasoned that because the payment occurred after the alleged criminal acts, it was irrelevant. The Court of Appeals panel agreed the payment was irrelevant—because motive was based on Bridges' mere perception of

potential insurance benefits, not the reality of what was actually received.

Our rejection of Bridges' position is more straightforward than the lower courts'. We acknowledge Bridges argues that he knew he would not receive all of the insurance proceeds due to his mortgage-secured home loan, which he claims negates any alleged financial motive to blow up the home. But we are unable to determine from his references to the record that he personally knew before the explosion he would actually receive anything less than the full amount of the proceeds. So we must presume the district court's action was proper. See *State v. Sappington*, 285 Kan. 176, 192, 169 P.3d 1107 (2007) (A defendant possesses the burden to designate a record that affirmatively shows prejudicial error. Without such a record, an appellate court presumes the action of the trial court was proper.).

The district court correctly granted the State's motion in limine to exclude this evidence.

Issue 2: *The motion to suppress Bridges' statements was correctly denied.*

Bridges argues that the district court erred by not suppressing statements he made to investigators during three separate interviews in 2004: (1) on July 16 at the explosion scene; (2) on July 27 at the Kansas City, Kansas, Police Department; and (3) on July 30 at Bridges' hotel room. He argues all three interviews were custodial interrogations. Concerning the July 16 statement, Bridges argues that he was not properly readvised of his *Miranda* rights. For the July 27 statement, he argues that he involuntarily waived his *Miranda* rights. For the July 30 statement, he argues he was never advised of his *Miranda* rights, but if so, he involuntarily waived them.

### Standard of Review

An appellate court reviews the district court's decision on a motion to suppress using a bifurcated standard. *State v. Gilliland*, 294 Kan. 519, 545, 276 P.3d 165 (2012), *cert. denied* 133 S. Ct. 1274 (2013). Without reweighing the evidence, the district court's find-

ings are reviewed to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed using a de novo standard. When the facts material to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. 294 Kan. at 545.

### The July 16 Interview

On July 16, Bridges drove to his property a few hours after the explosion. While Bridges was there, Fire Chief George Steens advised Bridges of his *Miranda* rights. Steens received Bridges' executed written waiver and asked questions which Bridges answered. As Bridges began to leave after the interview, Steens informed him that a police detective also wanted to speak with him.

Bridges then sat in the front seat of Detective Terry Mast's patrol car, with Mast in the driver's seat and Steens in the back. Mast did not advise Bridges of his *Miranda* rights prior to asking him questions. Although Bridges acknowledges that Chief Steens had advised him of his *Miranda* rights several minutes before his interview with Mast, Bridges claims Mast's failure to readvise him of those rights while he was in Mast's custody was a violation of the Fifth Amendment to the United States Constitution. The State responds the interview was not custodial but, if so, the *Miranda* warning by Steens was sufficient.

We begin our analysis by observing that law enforcement officers are only required to give *Miranda* warnings to those who are in custody and subject to interrogation. *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 [1966]; *State v. Warledo*, 286 Kan. 927, 935, 190 P.3d 937 [2008]). A custodial interrogation, as opposed to an investigatory interrogation, is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. *Warrior*, 294 Kan. at 496.

The district court concluded Bridges was not in Mast's custody but in noting Steens' prior *Miranda* warning, implied that warning was sufficient to cover the Mast interview if it was custodial. The Court of Appeals panel did not answer the threshold question of whether the Mast interview was custodial or investigatory. Instead, in affirming the district court, it determined that Steens' *Miranda* warning also covered the later Mast interview. We agree with the panel's holding and rationale, which negates the need for determining if the Mast interview is custodial or investigatory.

The question of whether a suspect should be re-*Mirandized* after waiver of those communicated rights is one of law that this court answers by considering the totality of the circumstances. See *State v. Mattox*, 280 Kan. 473, 489-90, 124 P.3d 6 (2005) (citing cases); see also *State v. Ransom*, 288 Kan. 697, 706-07, 207 P.3d 208 (2009); *State v. Nguyen*, 281 Kan. 702, 723-24, 133 P.3d 1259 (2006). One factor this court considers is the time interval between the waiver and the giving of the statement. *Ransom*, 288 Kan. at 706-07 (citing *Nguyen*, 281 Kan. at 723).

In first considering the time factor, we observe that Bridges admits only minutes elapsed between the end of the Steens *Mirandized* interview and the beginning of the Mast interview. See *Nguyen*, 281 Kan. at 724 ("under the rationale of *Mattox*, the waiver does not expire through the mere passage of 5 to 8 hours a suspect has been in continuous custody"). And here, as in *Nguyen*, "[t]here is no evidence in the record that anything happened after the waiver that affected [Bridges'] understanding of his rights." See 281 Kan. at 723-24. For example, like in *Nguyen*, here the same individual—Steens—was present when Bridges initially had been *Mirandized*, when Bridges had waived his *Miranda* rights, and then later when Bridges had spoken with Mast.

We conclude as a matter of law that under the totality of the circumstances, a second *Miranda* warning was not required for the Mast interview. See *Mattox*, 280 Kan. at 491.

### July 27 Interview

On July 27 Detective Michael Vega called Bridges and asked him to come to the detective bureau of the Kansas City, Kansas,

Police Department for questioning. Bridges drove himself there and submitted to a 4-hour unrecorded "pre interview" and then to a recorded interview. Bridges argues he was subjected to custodial interrogation and involuntarily waived his *Miranda* rights. The State responds that while the interview was not custodial and *Miranda* warnings therefore were not required, Bridges' waiver of those rights was voluntary.

The district court concluded Bridges was not in custody but was nevertheless *Mirandized* twice and gave a written waiver of those rights. It concluded Bridges' statement was voluntary. As with the July 16 interview, the Court of Appeals panel did not expressly answer the threshold question of whether the July 27 interview was custodial or investigatory. Instead, in affirming the district court, it held Bridges was properly *Mirandized* and voluntarily waived his rights in writing and by continuing to talk. We agree with the panel's holding and rationale, which again negates the need for a custodial determination.

We confirmed the two-step standard for determining the voluntariness of a *Miranda* waiver in *Mattox*, 280 Kan. 473, Syl. ¶ 3:

> "*An appellate court employs the same standard of review for determining the voluntariness of the waiver of* Miranda *rights as it does for assessing the voluntariness of a defendant's statement.* The inquiry requires an examination of the totality of the circumstances, and an appellate court reviews the factual underpinnings of the trial court's decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard." (Emphasis added.)

In other words, determining waiver is ultimately a legal conclusion. Similarly, as with the voluntariness of a confession, the State bears the burden of proof to establish the voluntariness of a *Miranda* waiver. *Colorado v. Connelly*, 479 U.S. 157, 168-69, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (the burden of proof for each is on the State by a preponderance of the evidence). And as with the voluntariness of a confession, it makes sense that for determining the voluntariness of a *Miranda* waiver, "an appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence." *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2005) (determining the voluntariness of a confession). Similarly, as with the voluntariness of a confession, the appellate

court should accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court. See *State v. Sharp*, 289 Kan. 72, 91, 210 P.3d 590 (2009) (determining the voluntariness of a confession).

We begin our analysis by acknowledging that "[T]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. . . . The voluntariness of the *waiver* of this privilege is always dependent on the absence of police overreaching." (Emphasis added.) *Connelly*, 479 U.S. at 170.

In our review of the totality of circumstances, we start with the district court findings that Bridges was read his *Miranda* rights shortly after he arrived at the detective bureau, and then again before his formal recorded statement was taken. It also found Bridges executed a written waiver of his *Miranda* rights.

These findings are supported by substantial competent evidence. See *Sharp*, 289 Kan. at 88 (substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved" [citing *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003)]. More particularly, Captain John Cosgrove testified the warnings were given twice. While Bridges testified he was not *Mirandized* before the recorded statement, an appellate court does not pass on the credibility of witnesses or resolve conflicts in the evidence. *Swanigan*, 279 Kan. at 23.

Additionally, a waiver of rights form signed by Bridges is in the record on appeal. As the Court of Appeals panel correctly observed, the waiver form clearly included the following statement:

"I have read this statement of my rights and understand what my rights are. *I am willing to make a statement and answer questions.* I do not want a lawyer at this time. I understand and know what I am doing. *No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.*" (Emphasis added.)

The panel observed that Bridges indicated he understood the waiver form and agreed to give a statement of his own free will. According to the panel's examination of the transcript of Bridges' recorded interview, it

"shows the defendant's *Miranda* rights were reviewed at the beginning of the interview. The defendant indicated he understood the form and agreed he wished to give a statement about the investigation, of his own free will. The defendant asked if he should have an attorney and the questioner told him that he needed to decide that for himself and that, 'You also have the right to stop answering at any time until you talk to a lawyer. If you don't want to answer a certain question, you can stop. If you don't want to engage in this at all right now, you don't have to. That's your right.' After being advised of all this, defendant was asked if he wanted to continue with the recorded statement, and the defendant indicated he did." *Bridges*, 2010 WL 1610393, at *5.

Our review of the interview transcript in the record on appeal reveals this observation is also supported by substantial competent evidence.

Nevertheless, Bridges apparently contends that the same facts not only show his interview was custodial but also help show his *Miranda* waiver—written or not—was involuntary. See *Mattox*, 280 Kan. at 483 (the issue of whether the defendant waived his or her *Miranda* rights can be virtually indistinguishable from the issue of whether the defendant's statement was voluntary). In support, Bridges points out: (1) he told Detective Vega that he was emotionally distraught and feeling too overwhelmed to talk at that time; (2) the interview occurred at the detective bureau interview room located behind several locked doors; and (3) the interview continued even after Bridges informed Vega that he had not slept in days and was emotionally shot and requested to continue the interview at a later date. *Cf. Warrior*, 294 Kan. at 496 (nonexclusive factors to be considered in determining if an interrogation is investigative or custodial include the time and place of the interrogation and duration of the interrogation); *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010) (nonexclusive factors to be considered in determining voluntariness of the confession include the accused's mental condition and the duration and manner of the interrogation).

We note the record reveals more circumstances to also be considered in the waiver voluntariness calculus. While Bridges told Detective Vega on the telephone that he was emotionally distraught and too overwhelmed to talk, it is uncontroverted—and the district court found—that he nevertheless then drove himself to the detective bureau for the interviews. The district court also

specifically noted Bridges' testimony that "he was an emotional wreck and he was depressed" but found Bridges talked to his father on a number of occasions and received advice about whether "he should or should not do these things." Additionally, there is no evidence in the record showing Bridges was ever handcuffed or restrained. Moreover, it is uncontroverted, and the district court found, that Bridges was allowed to leave the detective bureau immediately after the recorded interview was over. Cf. *Warrior*, 294 Kan. at 496 (factors to be considered in determining if an interrogation is investigative or custodial include whether the person being questioned was escorted by the officers to the interrogation location or arrived under his or her own power; the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; and whether the person was allowed to leave, was detained further, or was arrested after the interrogation).

In short, substantial competent evidence supports the district court's findings. We acknowledge Bridges testified that while at the detective bureau he requested to continue the interview until a later time. But under the totality of the circumstances, we independently conclude that Bridges' *Miranda* rights were voluntarily waived on July 27. There was no police overreaching. See *Connelly*, 479 U.S. at 170.

*The July 30 Interview*

At approximately 4:30 p.m. on July 30, Captain Cosgrove and Detective Vega interviewed Bridges at his room at the Drury Inn in Johnson County, Kansas. The officers knocked on the room's door and a recently awakened Bridges let them in for approximately 30 minutes.

Bridges argues he was subjected to custodial interrogation and that he was never advised of his *Miranda* rights. In the alternative, if he was advised, his rights were involuntarily waived. The State responds the interview was not custodial and although *Miranda* warnings therefore were not required, Bridges was nevertheless *Mirandized*.

The district court found Bridges was not in custody. It noted conflicting testimony regarding whether the *Miranda* warning had been given and noted the absence of a written waiver but held there was "nothing to indicate that . . . it was not a voluntary statement." In affirming the district court, the Court of Appeals panel agreed with the State that Bridges was not in custody but was nevertheless *Mirandized.*

Because the district court did not make an express determination that Bridges had been *Mirandized,* it therefore did not expressly determine if any waiver of those rights was involuntary. So we examine the threshold question answered by the district court and affirmed by the panel: whether Bridges was in custody. We agree that he was not in custody. Accordingly, we need not determine whether *Miranda* warnings had been given or, if so, whether Bridges had voluntarily waived those rights.

We recently articulated our approach to this custody question in *Warrior.* Nonexclusive factors to be considered in determining if an interrogation is investigative or custodial include: (1) the time and place of the interrogation; (2) the duration of the interrogation; (3) the number of law enforcement officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the officers to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. 294 Kan. at 496. "No one factor outweighs another, nor do the factors bear equal weight. Every case must be analyzed on its own particular facts. [Citation omitted.]" *State v. Schultz,* 289 Kan. 334, 341, 212 P.3d 150 (2009).

As with the appellate review of a district court's determination of whether a confession was voluntarily given or whether *Miranda* rights had been voluntarily waived, reviewing a determination of whether an interrogation is custodial requires two discrete inquiries:

"Under the first inquiry, the court determines the circumstances surrounding the interrogation, employing a substantial competent evidence standard of review. In determining if there is substantial competent evidence supporting the existence of the circumstances found by the trial court, an appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Edwards*, 291 Kan. 532, 545, 243 P.3d 683 (2010); *State v. Gant*, 288 Kan. 76, 80, 201 P.3d 673 (2009). The second inquiry employs a de novo standard of review to determine whether, under the totality of those circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. *Schultz*, 289 Kan. at 340-41; *State v. James*, 276 Kan. 737, 751, 79 P.3d 169 (2003)." *Warrior*, 294 Kan. at 497.

As we apply these principles to the July 30 episode, nearly all the factors indicate this interview was merely investigatory, not custodial.

We logically start our analysis with the time and place of the interrogation. A neutral location—as opposed to the police station—"weighs against a conclusion that an interview was custodial." *Warrior*, 294 Kan. at 497; see *State v. Summers*, 293 Kan. 819, 826, 272 P.3d 1 (2012) (defendant's parents' house); *State v. Woolverton*, 284 Kan. 59, 72, 159 P.3d 985 (2007) (stairwell of defendant's apartment complex); but see *Schultz*, 289 Kan. at 341 (at defendant's home but authorities told defendant not to move from the kitchen table and kept defendant under constant observation). It is undisputed that the interview occurred at Bridges' motel room at 4:30 on a July afternoon.

As for the duration of the interview, it was short: 30 minutes. This too weighs against a conclusion that the interview was custodial. As for the number of law enforcement officers, two were present, which could weigh toward custody. As for the conduct of those officers and the person subject to the interrogation, Captain Cosgrove testified he told Bridges that Bridges did not have to let them into the room to talk, that Bridges did not have to discuss anything with them, and they would leave if he so desired. Bridges testified that he let the officers in because he was tired and just wanted to get the interview over with. And the officers left without incident once the interview was over.

As for the presence or absence of actual physical restraint or its functional equivalent, Bridges was neither confined nor restrained

during his interview. Moreover, there were no "drawn firearms or a stationed guard." See *Warrior*, 294 Kan. at 496. No force or threat was used—indeed the Kansas City officers testified they told Bridges that they did not have "police authority" in Johnson County. They also testified they told Bridges they were only there to follow up with some additional questions regarding his two previous statements on July 16 and July 27—and after which he had voluntarily left the interviewers' presence.

As for whether Bridges was escorted to the interrogation location or arrived under his own power, Bridges clearly was in his own motel room when the officers arrived. Finally, as for whether Bridges was detained further or arrested after the interrogation, the officers left without him.

One factor listed in *Warrior* favoring Bridges' argument that he was in custody would be that the officers probably considered him to be a suspect. The Court of Appeals panel specifically observed: "[T]he defendant was clearly a suspect at [the] time." *Bridges*, 2010 WL 1610393 at *6. But the fact that a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings. *Warrior*, 294 Kan. at 503.

Although not mentioned in *Warrior*, some courts have held that reading *Miranda* rights to an interviewee may be included in the calculus to determine whether, under the totality of those circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. See *State v. Green*, 133 N.H. 249, 258, 575 A.2d 1308 (1990) ("the reading of *Miranda* warnings may be a factor in deciding whether a person is in custody under some circumstances"); see also *State v. Winegar*, 147 Ariz. 440, 448 n.6, 711 P.2d 579 (1985) ("though the *Miranda* warnings inform the suspect that she need not talk to the police and can have legal counsel, most people undoubtedly associate *Miranda* warnings with arrest"). Compare *United States v. Akin*, 435 F.2d 1011, 1013 (5th Cir. 1970) (the mere giving of *Miranda* warnings does not convert an otherwise noncustodial situation into a "custodial interrogation"); *State v. Simmons*, 329 S.C. 154, 157, 494 S.E.2d 460 (App. 1997) (same). Some testimony indicates Bridges was advised of his *Miranda* rights, *e.g.*, Captain Cosgrove's,

and other evidence indicates that he was not, *e.g.*, Bridges'. The district court's failure to make a finding either way does not assist the analysis. But to the extent Captain Cosgrove testified Bridges had been *Mirandized*, and we consider that in the calculus, we do not consider it a strong factor under these circumstances.

Accordingly, we conclude substantial competent evidence supports the trial court's findings. And although we acknowledge that two officers were present, that Bridges probably was considered a suspect, and that he was perhaps *Mirandized*, under the totality of the circumstances we independently conclude that he was not in custody during the July 30 interview. In other words, a reasonable person would have felt free to terminate the interview and disengage from the encounter in Bridges' hotel room. See *Warrior*, 294 Kan. at 497.

The district court correctly denied Bridges' motion to suppress his three statements.

Issue 3: *Bridges' argument that witnesses inappropriately commented on his credibility is not preserved for appeal.*

Bridges argues that several of the State's witnesses improperly commented on his credibility during trial. He acknowledges that he did not object to these comments. But he argues this court should nevertheless consider the merits of his argument to prevent the denial of his fundamental due process right to a fair trial. The State responds the issue is not preserved and no exception should allow consideration on the merits.

We have repeatedly required that "evidentiary claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009); see K.S.A. 60-404. In *King* we held that without a trial objection, defendant's argument that evidence was admitted in violation of his Fifth Amendment right to remain silent was not preserved for appeal. Bridges' evidentiary issue likewise is not preserved for our review. See also *State v. McCaslin*, 291 Kan. 697, 706, 245 P.3d 1030 (2011) (without a trial objection, argument that evidence was admitted in vio-

lation of Sixth Amendment's Confrontation Clause was not preserved for appeal).

Issue 4: *The prosecutor committed misconduct but the error was harmless.*

Bridges argues the prosecutor committed misconduct in his closing argument and the error is reversible. The State admits some error occurred but contends the error was harmless.

### Standard of Review

We have said that review of prosecutorial misconduct claims involves a two-step process. The court first decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we have said the court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012).

For years we have considered several factors in analyzing this second step: (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors has been individually controlling. *Marshall*, 294 Kan. at 857.

Since 2004, this court has also demanded that any prosecutorial misconduct error meet the "dual standard" of both constitutional harmlessness and statutory harmlessness to uphold a conviction. See *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004) (Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967], have been met.).

Under the constitutional harmless error analysis defined in *Chapman*,

"the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did

not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Under the harmless error analysis defined in K.S.A. 60-261, the test is equally clear. The court "determine[s] if there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." 292 Kan. 541, Syl. ¶ 6.

Under both standards, the party benefiting from the error—here, admittedly the State—bears the burden of demonstrating harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). That burden is higher when the error is of constitutional magnitude. See *Herbel*, 296 Kan. at 1110 ("Clearly, the party benefiting from the constitutional error must meet a higher standard to show harmlessness than the standard required in nonconstitutional error.").

*Discussion*

Bridges particularly complains that three statements made by the prosecutor during closing argument were improper commentary on Bridges' credibility. He claims the comments were gross and flagrant and demonstrated ill will.

Generally, prosecutors may not present their personal opinion of a witness' credibility to the jury because such comments constitute " 'unsworn, unchecked testimony.' " *Marshall*, 294 Kan. at 857 (quoting *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 [2000]). The determination of the truthfulness of a witness is for the jury. *State v. Elnicki*, 279 Kan. 47, Syl. ¶ 2, 105 P.3d 1222 (2005). But a prosecutor may comment on any inconsistencies in a defendant's statements or may point out the weaknesses in a particular story. See *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 (2009) ("When a defendant has told one story during interrogation and a completely different story at trial, it would be difficult for a prosecutor to comment on the evidence without suggesting that untruths existed.").

The first prosecutorial statement in closing argument about which Bridges complains was as follows:

"[Defense counsel] asks you to blame and to look down upon the police and the fire [departments] for continuing their investigation *when you know that the information provided by Mr. Bridges, the one person who could tell you exactly what happened that day, was false*, and he intentionally gave them *false information* the date that this happened and continued to do that until . . . confronted [by the insurance investigator]." (Emphasis added.)

We conclude this was a fair comment on the evidence because Bridges openly admitted to the investigators that he had made false statements during the investigation.

For Bridges' remaining complaints, the State conceded at oral arguments, and we agree, that parts of the closing arguments about the assistance with a water heater by Bridges' friend Roger Davis were outside the wide latitude afforded to prosecutors.

"Mr. Bridges tried to suggest to the investigators that Roger Davis paid $50 for [the dryer]. Roger Davis told you that's not what happened. *That's not true. It's not—it's not any more true than* Roger Davis came over and helped him on July 16, 2004[,] or that he called Roger Davis on July 16, 2004[,] or that Roger Davis helped install the prior water heater.

"He [Bridges] doesn't even want the police to know that he was able to install the first water heater. Why? Because that shows he knows how it works. That's what that shows. *So he concocts this story that Roger Davis came over and helped him with that*." (Emphasis added.)

Unlike the first statement, where the prosecutor was accurately pointing out Bridges admitted he had provided false information to the investigators, here the prosecutor actually misstated the evidence when informing the jury that Davis had not helped with the first hot water heater. Davis testified that he had indeed helped Bridges with it; allegedly helping with the later, exploding water heater is what Davis denied.

The prosecutor's misstatement was misconduct. " 'When a prosecutor argues facts that are not in evidence, this court has consistently found that "the first prong of the prosecutorial misconduct test is met." ' " *State v. Simmons*, 292 Kan. 406, 414, 254 P.3d 97 (2011); see also Gershman, Prosecutorial Misconduct § 11:30 p. 529 (2d ed. 2012) ("Whether the prosecutor deliberately tried to mislead the jury or did it inadvertently ordinarily is irrelevant. Misstating the record is a serious violation . . . ."); Prosecutorial Misconduct § 11:32, p. 533 ("By going beyond the record, the prose-

cutor becomes an unsworn witness, engages in extraneous and irrelevant argument, diverts the jury from its proper function, and seriously threatens the defendant's right to a fair trial.").

This evidentiary misstatement is aggravated by the prosecutor's further argument that essentially contended Bridges' true statement to the contrary was "not true." This additional argument is an improper comment on Bridges' credibility, as is the prosecutor's opinion that Bridges therefore "concoct[ed] this story." See, *e.g.*, *Elnicki*, 279 Kan. at 63 (prosecutor's comments calling the defendant's story a "fabrication" and "yarn" were "not based upon a later inconsistent statement, and were unquestionably outside the wide latitude allowed in discussing the evidence"); see also Prosecutorial Misconduct § 11:27, p. 526 ("Courts caution prosecutors against characterizing testimony as a 'lie' because such categorical and conclusory opinions make the prosecutor an unsworn witness and invade the province of the jury to determine credibility.").

With the misconduct established, we turn to the second analytical step. See *Marshall*, 294 Kan. at 857. This includes determining whether the prosecutor's improper statements were harmless error under the standards of both K.S.A. 60-261 and *Chapman*, 386 U.S. 18.

We recently held that where both the constitutional and non-constitutional error clearly arise from the very same acts and omissions, we logically begin with our harmlessness analysis of the constitutional error. See *Herbel*, 296 Kan. at 1111. We reach this conclusion because if we decide the constitutional error is not harmless and reverse the convictions, there is no point in analyzing whether the State met the lower standard for harmlessness under K.S.A. 60-261. *Herbel*, 296 Kan. at 1111.

In turning to our constitutional error analysis, we review the factors upon which Bridges relies to argue reversal and remand to the district court. Per *Tosh*, these are gross and flagrant conduct and prosecutorial ill will. See 278 Kan. at 93.

In determining whether prosecutorial misconduct was gross and flagrant, among the things we have considered are whether the comments were repeated, emphasized improper points, were planned or calculated, or violated well-established or unequivocal

rules. See, *e.g., State v. Brown*, 295 Kan. 181, 214, 284 P.3d 977 (2012). Our caselaw is well established: a prosecutor may not misstate the evidence or comment on the defendant's credibility. It is also well established that the prosecutor may not argue the defendant has lied or fabricated, *e.g.,* "concocted," a story. We therefore agree with Bridges and conclude the misconduct by the prosecutor was gross and flagrant.

In determining whether prosecutorial misconduct was motivated by ill will, among the things we have considered are whether the conduct was deliberate or in apparent indifference to a court's ruling. See, *e.g., Marshall*, 294 Kan. at 862; see also Prosecutorial Misconduct § 14.5, pp. 602-03 (" 'Other factors considered by courts in determining harmfulness are whether the prosecutor's misconduct was deliberate, related to a crucial issue in the trial, or was followed by a prosecutorial apology.' "); *cf.* Prosecutorial Misconduct § 10:51, p. 458 (a prosecutor's failure to obey court rulings increases the likelihood of reversal). As with determining gross and flagrant conduct, for determining ill will this court has also considered whether the conduct was repeated. See, *e.g., Marshall*, 294 Kan. at 862.

Here, the prosecutor's improper comments were made in close proximity to each other, which would suggest they were not "repeated" as we have typically viewed that term. Nor can we conclude they were made deliberately as we have typically viewed that term or made indifferently to a court ruling. The prosecutor may simply have become confused about which of the two water heaters Davis actually assisted Bridges on. We observe that Bridges himself admitted giving false and inconsistent statements to the investigators, which could have contributed to any prosecutorial confusion. Under these particular circumstances, we disagree with Bridges and conclude the misconduct was not motivated by ill will.

In continuing our constitutional harmlessness analysis, we address the State's argument that there is no reasonable possibility the misconduct contributed to the verdict. See *Ward*, 292 Kan. 541, Syl. ¶ 6. More specifically, we consider Bridges' admissions to the investigators that he probably, but accidentally, turned the gas valve in the wrong position ("on") and then left the home that

morning to go to work. His fiance, probably known by him to be a smoker, remained there—also probably known by him because she was recuperating from surgery. His crime of conviction, unintentional second-degree murder, requires the killing of a human being committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 21-3402(b).

Additionally, Bridges was admittedly in financial difficulties at the time. And he certainly could have been attempting to set the house on fire to claim insurance proceeds to forestall mortgage foreclosure and his second bankruptcy. Finally, Bridges eventually admitted that he had given false and inconsistent information to the investigators. So the prosecutor's arguments that misstated some evidence about the timing of Davis' assistance to Bridges and indicated that Bridges was "not true" and "concocted" parts of his story must be weighed against these other matters.

Considering the overall standard of review for determining the magnitude of constitutional error as articulated in *Ward,* 292 Kan. 541, Syl. ¶¶ 5-6, we conclude the prosecutorial misconduct was harmless error. In other words, the State has proven "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.,* where there is no reasonable possibility that the error contributed to the verdict." 292 Kan. 541, Syl. ¶ 6. Given this holding, we need not determine whether the State has met its burden of showing harmless error under the lower standard articulated in K.S.A. 60-261. See *Herbel,* 296 Kan. at 1111.

Issue 5: *The cumulative error doctrine does not apply to single trial error.*

Bridges contends that even if no single error at trial is sufficient to require reversal and remand, the cumulative effect of errors nevertheless deprived him of a fair trial. But the only error was in the prosecutor's closing argument, which we determined was harmless. We agree with the State that without more error to accumulate, the error remains harmless. See *State v. Houston,* 289

Kan. 252, 277, 213 P.3d 728 (2009) ("The presence of one [trial] error is obviously insufficient to accumulate.").

**Issue 6:** *The identical offense sentencing doctrine does not apply because involuntary manslaughter is a lesser included offense of reckless second-degree murder.*

Bridges next argues that instead of being sentenced for reckless second-degree murder under K.S.A. 21-3402(b), a severity level 2 person felony, he should have been sentenced for involuntary manslaughter under K.S.A. 21-3404(b), a severity level 5 person felony. More specifically, he argues that the two offenses contain identical elements and per the identical offense sentencing doctrine he must be resentenced for the lesser offense. Under this doctrine, if two criminal offenses have identical elements but different penalty classifications, a defendant convicted of either crime may be sentenced only under the lesser penalty provision. *State v. Thompson*, 287 Kan. 238, 258-59, 200 P.3d 22 (2009). The State responds that the doctrine is inapplicable to Bridges. See *State v. Sandberg*, 290 Kan. 980, 235 P.3d 476 (2010).

*Standard of Review*

Whether Kansas' identical offense sentencing doctrine applies is a question of law to which we apply de novo review. 290 Kan. at 984.

*Discussion*

In *Sandberg* we considered when to apply the identical offense sentencing doctrine. There, the defendant pled no contest to electronically soliciting a child in violation of K.S.A. 21-3523. At the time, the statute established two severity levels. A more severe punishment was imposed if the offender believed the person being enticed or solicited was younger than 14 years of age. K.S.A. 2006 Supp. 21-3523(a)(2), (b) (severity level 1 person felony). A less severe punishment was imposed if the offender believed the person was younger than 16 years of age. K.S.A. 2006 Supp. 21-3523(a)(1), (b) (severity level 3 person felony).

The age groups obviously overlapped. Relying on this overlap, the defendant—who was charged and pled no contest to the more

severe level 1 person felony—argued that the identical offense sentencing doctrine required the less severe level 3 person felony sentence.

After reviewing Kansas caselaw, we identified three situations where the doctrine may apply: " ' "(1) where one statute defines a lesser included offense of the other and they carry different penalties . . . ; (2) where the statutes overlap and carry different penalties . . . ; (3) where the statutes are identical . . . ." ' " *Sandberg*, 290 Kan. at 986 (quoting *State v. Campbell*, 279 Kan. 1, 14, 106 P.3d 1129 [2005]).

We recognized the first situation involving lesser included offenses and their different penalties was "unobjectionable." We stated:

> " ' "The first of the three is certainly unobjectionable. Such provisions are quite common (robbery-armed robbery; battery-aggravated battery; joyriding-theft; housebreaking-burglary), and usually are a consequence of a deliberate attempt by the legislature to identify one or more aggravated characteristics which in the judgment of the legislature should ordinarily be viewed as making the lesser crime more serious. They afford guidance to the prosecutor, but . . . do not foreclose the prosecutor from deciding in a particular case that, notwithstanding the presence of one of the aggravated facts, the defendant will still be prosecuted for the lesser offense." ' " *Sandberg*, 290 Kan. at 986 (quoting *Campbell*, 279 Kan. at 14).

We concluded that Sandberg's case fell within the first category: lesser included offenses. See K.S.A. 21-3107(2)(a) (lesser included offense is, *inter alia*, a crime that is a "lesser degree of the same crime"). After observing our past cases' limited application of the identical offense sentencing doctrine to "*two* criminal offenses that . . . have identical elements," while "in contrast Sandberg [had] attempt[ed] to apply the doctrine to severity levels of the *same* offense," 290 Kan. at 985, we refused to extend the application of the doctrine to "severity levels of the same offense." 290 Kan. at 988.

Per *Sandberg*, we must now decide whether the doctrine applies to Bridges' situation. As mentioned, he argues that while he was sentenced for reckless second-degree murder, a severity level 2 crime, he instead should have been sentenced for involuntary manslaughter, a severity level 5 crime.

We begin with the reckless second-degree murder language in K.S.A. 21-3402(b), which states:

"Murder in the second degree is the killing of a human being committed:

. . . .

(b) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life."

In turn, the involuntary manslaughter language in K.S.A. 21-3404 states in relevant part:

"Involuntary manslaughter is the unintentional killing of a human being committed:

. . . .

"(b) in the commission of, or attempt to commit, or flight from any felony, other than an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto, that is enacted for the protection of human life or safety or a misdemeanor that is enacted for the protection of human life or safety, including acts described in K.S.A. 8-1566 and subsection (a) of 8-1568, and amendments thereto, but excluding the acts described in K.S.A. 8-1567 and amendments thereto."

Bridges notes that unintentional second-degree murder is not an inherently dangerous felony. See K.S.A. 21-3436. So he argues that the elements of involuntary manslaughter for subsection (b) of 21-3404 could be read in conjunction with subsection (b) of 21-3402 as follows: "Involuntary manslaughter is the unintentional killing of a human being committed . . . in the commission of . . . [the killing of a human being committed unintentionally but recklessly under the circumstances manifesting extreme indifference to the value of human life]." Bridges then argues that because second-degree murder is entirely subsumed in involuntary manslaughter through his interpretation, he must be sentenced for the lesser violation of involuntary manslaughter. The State responds that such an interpretation leads to the absurdity that a killing done "in the commission of a killing" results in a lesser offense than the original killing. We agree with the State.

In addition, per *Sandberg*'s analytical framework, we conclude Bridges' situation actually falls within *Sandberg*'s first category—lesser included offenses. We recently affirmed that involuntary manslaughter is one of four degrees of homicide. See *State v. Chee-*

*ver*, 295 Kan. 229, 258, 284 P.3d 1007 (2012) ("[O]ur caselaw has recognized the following homicide degree crimes, in descending order: first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter."). As we explained in *Cheever*:

> "Kansas has long-recognized that the generic crime of homicide, ' "of which murder is the highest and most criminal species, is of various degrees, according to circumstances. The term . . . is generic, embracing every mode by which the life of one man is taken by the act of another.' " *State v. Gregory*, 218 Kan. 180, 182-83, 542 P.2d 1051 (1975) (citing *State v. Ireland*, 72 Kan. 265, 270, 83 Pac. 1036 [1905] [quoting *Commonwealth v. Webster*, 59 Mass. 295, 1850 WL 2988 (1850)]). Thus, in *Gregory*, we held that *involuntary manslaughter is a lesser degree of second-degree murder and is therefore a lesser included crime under K.S.A. 21-3107(2)(a). We explained that while it appears murder and manslaughter are different crimes, ' "they involve but one crime and are only degrees of felonious homicide." '* 218 Kan. at 183 (quoting Warren on Homicide § 83, pp. 415-16)." (Emphasis added.) 295 Kan. at 258.

We have also specifically held that involuntary manslaughter as set out in subsection (a) of K.S.A. 21-3404 is a lesser included crime of both first- and second-degree murder. See *State v. Engelhardt*, 280 Kan. 113, 135, 119 P.3d 1148 (2005). Given our holding in *Cheever*, it logically follows that involuntary manslaughter as set out in subsection (b) of K.S.A. 21-3404 is likewise a lesser included offense of unintentional second-degree murder as set out in subsection (b) of K.S.A. 21-3402. See K.S.A. 21-3107(2)(a) ("A lesser included crime is [a] lesser degree of the same crime.").

We held in *Sandberg* that the identical offense sentencing doctrine does not apply to lesser included offenses. Per *Sandberg's* rationale and holding, we therefore conclude the district court correctly sentenced Bridges for the severity level 2 person felony and not the lesser included severity level 5 person felony.

*Issue 7: The district court's order that Bridges pay a Board of Indigents' Defense Services application fee was constitutional.*

Bridges initially argued that the district court's order for him to pay a fee to apply for a defense from the Board of Indigents' Defense Services was unconstitutional. He now acknowledges this court has previously rejected this argument. See *State v. Casady*,

289 Kan. 150, 158-59, 210 P.3d 113 (2009). We continue to reject this argument.

The judgment of the district court is affirmed.