IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 104,266

STATE OF KANSAS,
*Appellee*,

v.

DARREN KNOX,
*Appellant*.

SYLLABUS BY THE COURT

1.

The justification of self-defense is not available to a person who initially provokes the use of force unless he or she has exhausted every means to escape from imminent danger or has communicated the good-faith intent to terminate the use of force.

2.

Even if an appellate court presumes the district court erred in failing to give an unrequested instruction, the error is not reversible if, as here, the complaining party fails to firmly convince the appellate court that the jury would have reached a different verdict had the instruction error not occurred.

3.

A prosecutor's statements during closing argument that a witness was "brutally honest" and "was on the stand telling you the truth" state the prosecutor's personal opinion as to the credibility of a witness and are misconduct.

4.

A prosecutor commits misconduct by arguing facts not in evidence.

1

5.

A prosecutor's statement that suggests the goal and purpose of a criminal defense attorney is to take bystanders who happen to witness a crime and portray them as deceptive and dishonest demeans both the adversarial process and defense counsel's role in that process, and it is misconduct.

6.

Under the facts of this case, the prosecutor's misconduct does not warrant reversal of the defendant's conviction because the misconduct was not gross and flagrant, was not motivated by ill will, and would likely have had little weight in the minds of jurors in light of the strength of the evidence.

7.

Evidence of a third party's motive will be excluded for relevance where nothing else connects the third party to the crime.

8.

The failure to make a proffer of excluded evidence precludes appellate review if there is no other basis in the record to determine whether the district court erred in excluding the evidence.

9.

When faced with a cumulative error allegation, an appellate court exercises unlimited review over the totality of the circumstances in the case and determines whether the cumulative effect of multiple errors substantially prejudiced the complaining party so as to deny a fair trial. If any one error is constitutional, the party benefitting from

the multiple errors must establish the cumulative error is harmless beyond a reasonable doubt.

Appeal from Wyandotte District Court; ROBERT P. BURNS, judge. Opinion filed April 10, 2015. Affirmed.

*Rachel L. Pickering*, assistant public defender, 3rd J.D., argued the cause and was on the brief for appellant.

*Jennifer L. Myers*, special assistant district attorney, argued the cause, and *Christopher L. Schneider*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.:  A jury convicted Darren Knox of premeditated first-degree murder under K.S.A. 21-3401(a). In this direct appeal from that conviction, he raises six issues, which we have reordered. None of the issues presents reversible error. We hold:

(1) Knox was not entitled to an instruction on self-defense because the evidence, even when viewed in the light most favorable to Knox, established Knox's use of deadly force was not legally justified. Rather, Knox provoked the confrontation;

(2) The district court did not commit clear error by failing to instruct on second-degree intentional murder. In light of the strong evidence of premeditation, Knox does not firmly convince us the jury would have returned a different verdict had the instruction been given;

3

(3) While the prosecutor committed misconduct during closing arguments by vouching for the credibility of some witnesses, discussing facts not in evidence, and disparaging the defense, the statements did not deny Knox a fair trial;

(4) The district court did not err in excluding evidence suggesting a third party might have had a motive to commit the murder because no evidence connected a third party to the crime;

(5) Knox did not make a sufficient proffer to preserve his argument that the district court violated his confrontation rights by limiting cross-examination of a State witness; and

(6) The one presumed instructional error and the several instances of prosecutorial misconduct did not cumulatively deprive Knox of a fair trial.

FACTS AND PROCEDURAL BACKGROUND

On August 3, 2008, around 1 p.m., Krystal Fears was in the upstairs bedroom of her house when she heard what she thought were fireworks. She ran to the window. Outside, three young men were walking down the street shooting at the passenger side of a white Mustang that had pulled into the driveway of a house across the street. The driver of the Mustang was Fears' friend, Lafayette Morris. Morris tried to exit the car and run, but he collapsed from a mortal gunshot wound. The three men ran up the street, and Fears ran out of her house to help Morris.

Fears initially told detectives that two of the three men were shooting at Morris' Mustang but later she could not remember how many men had fired shots. During Knox's first trial, which ended in a hung jury, Fears testified to seeing Morris with a gun firing

4

back at the three men. But she did not remain consistent on this point. In Knox's second trial, she testified that Morris did not have a gun. Investigators never found a handgun in Morris' possession or on the scene.

Fears' sister was also home when the gunshots began. She too looked out her upstairs window to see three men in the street. She only remembered seeing one man fire a gun at Morris' car, and she could not recall what the other two men were doing or if they had weapons.

Fears' mother heard the gunshots from the downstairs kitchen and ran to the front door. She told investigators that she saw two young men in the street; one was shooting at Morris and the other was running. She saw Morris get out of his Mustang and fall as he tried to run.

At the scene, investigators found Morris' body lying in a pool of blood near the driver side of the Mustang. A subsequent autopsy revealed that a fatal 9mm bullet had entered the right side of Morris' chest, collapsed both of his lungs, and came to rest in the soft tissue of his left arm. The Mustang had three bullet holes in its passenger side window and three bullet holes in its passenger side quarter panel. Outside the Mustang on the passenger side, investigators collected three fired .40 caliber cartridges and four fired 9mm cartridges. There were no bullet holes on the driver side, no fired cartridge cases inside the Mustang, and no fired cartridge cases outside the Mustang on the driver side.

Less than 2 weeks after Morris' murder, an acquaintance of Morris', Darrius Freeman, told his probation officer that he was being shot at and threatened; he wanted to document who was after him in case he had to defend himself. Freeman said that after Morris' murder, "RonRon" called him and told him, "We got your boy Laffy [Lafayette Morris], now you and Shookie next." The probation officer referred Freeman to a police

5

detective. Although Freeman talked to the detective about the phone call, he would not disclose any information about Morris' murder because he did not want to be a "snitch." The record does not clearly establish whether Freeman or investigators knew "RonRon's" legal name at that point, but at the second trial the jury heard a recorded conversation in which Knox identified himself by using that nickname.

A little over a month after Freeman's initial report to his probation officer and the detective, Freeman decided to provide additional information about Morris' murder. The change of mind occurred after Freeman was charged with federal crimes and reached a plea agreement that obligated him to cooperate with the investigation of Morris' murder. According to Freeman's statement, on the day of Morris' murder, Freeman heard gunshots as he left a house located about a block from where Morris was shot. Freeman hid on the side of the house. After the shots stopped, he saw one of his longtime enemies—Chris Holliday—and three other men—Mack Calhoun, Casey Ellis, and "RonRon"—holding guns and running to a nearby orange Avalanche SUV. Freeman recognized the vehicle as belonging to Holliday. The Avalanche was parked in front of a white truck that Freeman knew belonged to another enemy, Darren Allen. After the men entered the vehicles, they drove away. Freeman also informed police that the orange Avalanche was painted black soon after. And law enforcement did later pick up a black Avalanche, which clearly used to be orange that contained Holliday's identifying information. Although Freeman picked others out of photographic lineups, he was unable to identify Knox.

Armed with the new information from Freeman, investigators went back to Fears, who was less than eager to cooperate further. When detectives finally obtained an interview with her, they showed her a black and white lineup that included Knox's picture and asked if she could identify the primary shooter. She asked to see the photographs in color, and from the color lineup she identified Knox as the primary shooter. At trial, the defense attacked the credibility of this identification because Fears had labeled Calhoun

as the primary shooter in a previous photographic lineup. Moreover, Fears had testified prior to trial that officers "hinted" at which photograph she should pick, though she clarified that she only meant that the officers told her Knox's name after she had picked his photograph. Fears' mother also picked Knox out of the same color lineup. But Fears' sister could not identify anyone from any lineup.

By the time investigators linked Knox to Morris' murder, Knox was incarcerated on not-yet related charges. He had been arrested about a week after Morris' murder for unlawful possession of a .40 caliber Taurus pistol. That charge arose when Kansas City police officers searched an SUV incident to a traffic stop. The officers found the Taurus pistol directly below the back passenger seat occupied by Knox. Subsequent ballistics testing revealed that the .40 caliber cartridges found at the scene of Morris' murder were fired from that Taurus pistol.

The State charged Knox with premeditated first-degree murder. Prior to trial, the State filed two motions in limine; one seeking to prohibit evidence of drugs and guns that had been found in the house at which Morris was shot and another seeking to prohibit evidence of drugs and a rifle found stashed between the center console and passenger seat of Morris' Mustang. After a hearing on the motions and over defense objection, the district court granted the motions in limine, finding the evidence not relevant or probative to the case.

Knox and Calhoun were originally tried in November 2009 as codefendants, but the trial ended in a mistrial after the jury could not come to a verdict. Knox's second trial—without Calhoun as codefendant—began in December 2009. Fears, the State's first witness, expressed hostility throughout her trial testimony. She testified that she was frustrated, did not want to be involved, and did not cooperate with police. She also admitted that her testimony was inconsistent at points—inconsistencies the defense

7

readily elicited. Freeman testified as well, and the defense questioned him extensively on the plea agreement that led to his cooperation in this case. Also, Freeman equivocated when defense counsel asked him whether he knew "RonRon's" last name before law enforcement officers told him. When asked why it took him so long to come forward with information, Freeman testified that he wanted to get Morris' murderers himself, but once incarcerated he knew that could not happen. Fears' mother and sister also testified, mostly corroborating Fears' version of events but differing in some details. In addition, the State called various law enforcement officers and forensics experts. Knox presented one witness after the State rested, a man who took photographs and measurements of the location of the murder (about a year after the murder) to provide the jury with the witnesses' viewpoints and show the distances involved.

During the instruction conference, Knox requested a self-defense instruction based on the fact that no witnesses saw the shooting begin; he argued that Morris could have fired the first shot. But the district court denied the request. After deliberations, the jury found Knox guilty of premeditated first-degree murder. Subsequently, the district court sentenced Knox to life in prison without the possibility of parole for 25 years.

Knox timely appealed to this court, and jurisdiction is proper under K.S.A. 22-3601(b)(1) (life sentence imposed).

ANALYSIS

Issue 1: *Was Knox entitled to his requested instruction on self-defense?*

Knox argues the district court erred when it denied his request for an instruction on self-defense. In arguing the instruction should have been given, Knox focuses on the lack of direct evidence regarding who fired the first shot and emphasizes Fears' testimony

8

at the first trial in which she stated that she saw Morris shooting at the three men. Although she contradicted that testimony during Knox's second trial, Knox's attorney cross-examined her with her earlier testimony. On appeal, Knox argues the jury could reasonably have believed he acted in self-defense.

### 1.1 *Standard of review and analytical framework*

Because Knox requested a self-defense instruction, a four-step analysis applies to our consideration of his arguments. Those four steps and the standards of review that correspond to each are:

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

### 1.2 *Parties focus on step three; instruction was not factually supported*

In applying those steps in this appeal, the parties focus on the third step—whether the instruction was factually appropriate. Nevertheless, we must examine each step. Regarding the first step, as we have already stated and as the parties agree, we have jurisdiction over Knox's appeal. Further, Knox preserved this issue by requesting a self-defense instruction. The parties are also correct that a self-defense instruction would have been legally appropriate. See K.S.A. 21-3211(b) (permitting use of deadly force in self-

defense); see also, *e.g.*, *State v. Jackson*, 262 Kan. 119, 122-23, 936 P.2d 761 (1997). So, like the parties, we turn our focus to the third step and consider the factual appropriateness of a self-defense instruction.

A requested instruction relating to a theory of defense, such as self-defense, is factually appropriate if there is sufficient evidence, when viewed in the light most favorable to the defendant, for a rational factfinder to find for the defendant on that theory. *State v. Story*, 301 Kan. 702, 710, 334 P.3d 297 (2014). We examine sufficiency against the applicable defense's legal elements, which in the case of self-defense are defined in K.S.A. 21-3211. Under that statute, deadly force can only be justified to the extent a person "reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." K.S.A. 21-3211(b). But the justification of self-defense "is not available to a person who . . . initially provokes the use of force against himself" unless he or she has exhausted every means to escape from imminent danger or has communicated the good-faith intent to terminate the use of force. K.S.A. 21-3214(3)(a)-(b); *State v. Salary*, 301 Kan. 586, Syl. ¶ 3, 343 P.3d 1165 (2015). This limitation makes the self-defense instruction factually inappropriate in this case.

Knox and the other man or men approached Morris in his Mustang; there was no direct or circumstantial evidence suggesting that Morris provoked the confrontation. See *Salary*, 301 Kan. at 596-97 (self-defense instruction not available to person who leaves a confrontation and then returns with a firearm); *State v. Nelson*, 291 Kan. 475, 481, 243 P.3d 343 (2010) (rejecting claim that defendant was not the aggressor when he chose to go to victim's house after a verbal altercation hours earlier). Further, the circumstantial evidence indicates that Knox and the others ambushed Morris and fired the first shots.

Several pieces of evidence lead to these conclusions. First, even after the shots were fired, neighbors could hear the Mustang's radio, suggesting that Morris had no more

than pulled up to the house when Knox and the others confronted him. And the jury also heard that Morris was Freeman's "boy" and that Freeman considered at least two of Knox's companions to be enemies. Finally, while no eyewitness testified to who fired the first shot, the forensic evidence eliminates the possibility that the first shot came from Morris.

Specifically, blood and gunshot patterns indicate the first shots came from outside the passenger side of the car. Fears testified that the men were shooting at Morris before he exited his Mustang, and investigators found blood inside the Mustang. No physical evidence supports a conclusion that Morris fired a shot from inside the car. If Morris had fired first—or even somewhat contemporaneously with the six bullets that penetrated the Mustang from the passenger side—at least one of the bullet holes in Morris' Mustang would necessarily have been created from a shot exiting the car. But all of the bullets that damaged the Mustang came from outside the passenger side. And some of these bullets went through the rolled-up passenger side window, which leaves no room for arguing that Morris might have shot through an open window. Significantly, investigators did not find any fired bullet cartridges inside the Mustang or outside on the driver's side where Morris died.

Thus, the evidence points only to Knox and his companions as the aggressors, aggressors that did nothing to escape from imminent danger or to communicate the intent to terminate the use of force. Even assuming Morris had a gun and at some point fired it, and assuming this was something other than an ambush, Knox's group clearly—without necessity—chose to walk down the street towards Morris and engage him in a gunfight. "The doctrine of self-defense cannot be invoked to excuse a killing done in mutual combat willingly entered into." *State v. Barnes*, 263 Kan. 249, 266, 948 P.2d 627 (1997).

11

The evidence in this case, even in the light most favorable to Knox, does not provide factual support for a self-defense instruction on Knox's behalf. As a result, the district court did not err in denying Knox's request for such an instruction.

Issue 2: *Did the district court commit clear error by failing to instruct on second-degree intentional murder?*

Knox alleges another error arising from the failure to give a jury instruction. Specifically, he argues the district court should have *sua sponte* instructed the jury on the lesser included offense of second-degree intentional murder. Once again, Knox primarily focuses on the lack of an eyewitness to the events that happened before Fears got to her window. He argues this leaves a potential inference that Knox saw Morris with a gun and formed the intent to kill Morris instantaneously—without premeditation.

### 2.1 *Standard of review and analytical framework*

Our standard of review differs for this issue because, in contrast to the self-defense instruction, Knox did not request a lesser included offense instruction on second-degree intentional murder. When a party fails to object to or request a jury instruction at trial, K.S.A. 22-3414(3) limits appellate review to a determination of whether the instruction was clearly erroneous. The application of this standard consists of two parts. "[T]he reviewing court must first determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012). Second, if the trial court erred, the reviewing court must conduct a reversibility inquiry. For the error to be reversible, the reviewing court must be "firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a

clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." 295 Kan. 506, Syl. ¶ 5.

2.2 *Assuming error, not reversible*

Regarding the first stage of our analysis, the State does not dispute that a second-degree intentional murder instruction was legally appropriate. Indeed, second-degree intentional murder is a lesser included offense of premeditated first-degree murder. See *State v. Scaife*, 286 Kan 614, 619-20, 186 P.3d 755 (2008). The State does dispute, however, whether an intentional second-degree murder instruction was factually appropriate. Nevertheless, we need not burden this opinion with the ins and outs of the parties' arguments on this point because, even if we presume that the instruction should have been given, Knox fails to firmly convince us that the jury would have convicted him of second-degree intentional murder rather than first-degree premeditated murder.

While both second-degree intentional murder and first-degree premeditated murder are intentional crimes, first-degree murder has the additional element of premeditation. See *State v. Jones*, 279 Kan. 395, 401, 109 P.3d 1158 (2005). Notwithstanding conflicting evidence about whether Morris held a gun, the evidence strongly established that Knox intentionally shot Morris with the intent to kill and did so with premeditation.

"Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation." *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014). A number of factors assist in determining premeditation: "'(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and

13

during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.'" 299 Kan. at 467 (quoting *Scaife*, 286 Kan. at 617-18).

Here, Knox's group—at least two of whom had guns—strategically parked their vehicles and walked down the street towards Morris' Mustang as it pulled into the driveway. Even before Morris had a chance to turn off his conspicuously loud radio, the men shot at him from the Mustang's passenger side. The gun later found in Knox's possession—or his constructive possession, at least—had fired several of the bullets. After Morris fell to the ground, the men ran to the parked vehicles and fled the scene. One of the vehicles, the orange Avalanche, was painted black soon after. And within weeks of Morris' murder, Knox called to threaten Morris' friend—Freeman—telling Freeman, "We got your boy Laffy, now you and Shookie next." These circumstances strongly suggest planning.

At trial, these circumstances were mostly undisputed. Knox primarily argued he had been misidentified and was not present during the shooting. Although he challenged the credibility of witnesses and highlighted conflicting evidence, those conflicts did not impact the circumstances that strongly suggested premeditation—the guns, ambushing Morris as he pulled into his driveway, and fleeing to waiting vehicles (one of which was soon repainted). Certainly, evidence of the subsequent threat against Morris' friend, Freeman, depended on Freeman's credibility. But even a juror who rejected some of Freeman's testimony might have given credence to Freeman's initial statement to the detective, which preceded his plea agreement.

In light of this strong evidence of premeditation, Knox fails to firmly convince us that the jury would have returned a different verdict had they received the second-degree intentional murder instruction. See *Salary*, 301 Kan. at 602 (finding harmless error in the failure to instruct on voluntary manslaughter given strong evidence of premeditation). In

14

other words, even if the instruction was legally and factually warranted, Knox fails to establish clear error.

Issue 3: *Did the prosecutor improperly bolster the State's witness and disparage the defense so as to deprive Knox of a fair trial?*

Knox argues that prosecutorial misconduct during closing arguments prejudiced the jury against him and denied him a fair trial. Specifically, he contends that the prosecutor improperly bolstered Freeman's credibility and disparaged the defense.

### 3.1 *Analytical framework*

This court utilizes a two-step process to review allegations of prosecutorial misconduct:

> "First, an appellate court determines whether there was misconduct, *i.e.*, whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial." *State v. Armstrong*, 299 Kan. 405, 416, 324 P.3d 1052 (2014).

### 3.2 *Prosecutor committed misconduct*

Knox complains about the prosecutor's statements during closing argument in which she said that Freeman "was brutally honest on the stand," that he "was on the stand telling you the truth," and that "we asked [Freeman] to tell the truth, and that's what he wanted is he wanted street justice." Then, after the defense closing, in which Knox's attorney challenged the credibility of the State's witnesses and brought up their

15

inconsistent testimony, the State argued in rebuttal why witnesses might have testified as they did:

> "Remember in voir dire we talked about why would a person not want to testify? [Defense counsel] made a big deal about this, and you can use that now. Well, maybe they're not as educated.

> "Darrius Freeman, 11th grade, not even a GED. Krystal Fears, 19 years old, because you have experienced attorneys where you're not experienced, [Defense counsel] has about nine years of experience on top of a law degree. You think he has a little bit more experience than Krystal Fears? Yes. *His job is to make them look like liars. That's his job and that's what he was trying to do.*" (Emphasis added.)

As Knox correctly argues, "[a] prosecutor should not comment on the credibility of his or her own witnesses." *State v. Elnicki*, 279 Kan. 47, Syl. ¶ 6, 105 P.3d 1222 (2005); see Kansas Rules of Professional Conduct 3.4(e) (2014 Kan. Ct. R. Annot. 619-20) ("A lawyer shall not . . . state a personal opinion as to . . . the credibility of a witness."). Here, the prosecutor's statements that Freeman was "brutally honest" and "was on the stand telling you the truth," while limited in context, were statements of the prosecutor's personal opinion regarding Freeman's credibility. As such, the comments were unsworn and unchecked statements that are not fair commentary on the evidence. See, *e.g.*, *State v. Bridges*, 297 Kan. 989, 1013, 306 P.3d 244 (2013); *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010). More subtly, the prosecutor implied that Freeman and Fears were truthful when she argued defense counsel's job was to make them out as liars, suggesting to the jurors that any potential concerns they might have about the credibility of these witnesses stemmed from sly defense tactics rather than the evidence.

Furthermore, by representing the level of defense counsel's experience, the prosecutor argued facts not in evidence, which is misconduct. See *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009). The prosecutor's statement that it was defense counsel's

job to "make [the witnesses] look like liars" disparaged the role of defense counsel in the adversarial process. Certainly, defense counsel uses the adversarial process to point out weaknesses in the State's case—areas where there may be a reasonable doubt. And doing so may sometimes expose a witness as a liar—*i.e.*, as one who presents false information with the purpose of deceiving. See Webster's II New College Dictionary 531, 631, 633 (1999) (defining "liar" as "[o]ne who tells lies" and "lie" as "[t]o present false information with the purpose of deceiving").

More often, defense counsel exposes the reality that eyewitnesses to stressful events, even when doing their best to be fully honest, vary in their perceptions of and ability to remember the details. Or, if a witness has repeatedly recounted the events to friends, family, investigators, attorneys, or others and has heard others accounts, defense counsel may reveal the false certainty that comes from repeating a statement. Other circumstances such as distance, light, distractions, fading memory, bias, or suggestive influence may be explored. Trials expose these realities, but these realities do not necessarily cast some witnesses as liars—ones who purposefully deceive—and others as automatons programmed to accurately recount events. To suggest the purpose of a criminal defense attorney is to take bystanders who happen to witness a crime and portray them as deceptive and dishonest demeans both the adversarial process and defense counsel's role in that process, and it is misconduct. See *State v. Crum*, 286 Kan. 145, 150, 184 P.3d 222 (2008) (counsel may comment on trial tactics but cannot disparage opposing counsel).

3.3 *Misconduct did not deny Knox a fair trial*

In light of the misconduct, we must consider whether the prosecutor's comments prejudiced Knox and denied him a fair trial. Three factors control this analysis: "'(1) whether the misconduct was gross and flagrant; (2) whether it was motivated by

17

prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors.'" *Armstrong*, 299 Kan. at 416 (citing *Bridges*, 297 Kan. at 1012). No single factor is controlling, but the third factor can override the first two factors only if "'the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Armstrong*, 299 Kan. at 417 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012]) (noting application of both statutory and constitutional harmlessness analysis under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967], but recognizing that, as a practical matter, the outcome turns on the constitutional standard because it is more rigorous).

In determining whether a prosecutor's comments are gross and flagrant, this court generally considers whether the statements violated well-established or unequivocal rules; emphasized improper points; or were repeated, planned, or calculated. *Bridges*, 297 Kan. at 1015-16. Certainly, it is well established that a prosecutor cannot comment on the credibility of witnesses or discuss facts not in evidence. See, *e.g.*, *State v. Pabst*, 268 Kan. 501, 506-07, 996 P.2d 321 (2000).

In this case, we do not deem the prosecutor's comments about Freeman, Fears, and defense counsel to be flagrant violations of this rule. The prosecutor's theme and repeated message to the jurors was that they should look at a variety of factors and use their common sense when assessing credibility. That by itself might not save the prosecutor from a gross-and-flagrant label, but, in context, the implication that the prosecutor believed the witnesses to be credible was very limited in scope and subtle.

18

Specifically, the comment that Freeman was "brutally honest" referred directly to his statement that he did not know what benefit he would receive from his federal plea deal. Given this context, one might interpret the prosecutor's statement as a warning to the jury that Freeman might be willing to say almost anything to improve his chances of favorable treatment in federal court. The second statement—"[h]e was on the stand telling you the truth . . . [and] we just asked him to tell the truth, and that's what he wanted is he wanted street justice"—were limited to Freeman's explanation as to why he did not cooperate earlier in the investigation. Again, while inappropriate, the prosecutor did not attempt to put her appraisal of honesty on all of Freeman's testimony. Also, the prosecutor encouraged the jury to conclude from Freeman's demeanor and his motivations that he was truthful, which was not misconduct. Finally, to the extent the prosecutor implied Freeman and Fears were truthful when she said that the defense counsel's "job is to make them look like liars," the implication is so subtle that we question whether jurors would have understood the improper message. And while that comment may have demeaned the defense somewhat, it is at least partially true and not overly offensive. Moreover, the statements about Freeman's and Fears' credibility and the defense counsel's "job" were couched in terms of asking the jurors to use their common sense and to recognize that Fears and Freeman did not ask to be witnesses. The prosecutor pointed out the length of time Fears spent on the stand and suggested she had become frustrated with the process of cross-examination; Fears even asked the judge if she could leave at one point.

With small alterations in word choice, each comment would have been perfectly appropriate. Consequently, we conclude the conduct was neither gross nor flagrant.

Second, this court considers whether the statements were motivated by ill will, which "is often 'reflected by repeated and deliberate misconduct'" or indifference to a court's ruling. *Armstrong*, 299 Kan. at 419 (quoting *State v. Inkelaar*, 293 Kan. 414, 430,

19

264 P.3d 81 [2011]); *State v. Marshall*, 294 Kan. 850, 862, 281 P.3d 1112 (2012). Here, the prosecutor did not violate any express court order, and the honesty statements were in close succession, which taken alone is not typically viewed as being "repeated." *Bridges*, 297 Kan. at 1016. And the prosecutor did not emphasize the statements. Read in full context, the prosecutor's remarks appear to be nothing more than a poorly worded attempt to make a legitimate argument—that the evidence established Knox's guilt and the defense's attempt to raise the specter of reasonable doubt should not persuade the jury. Additionally, as we have discussed, the scope of the prosecutor's remarks was limited. Given the subtle or limited scope of the statements, we find no evidence of ill will.

Finally, we consider whether the State has satisfied its burden of proving "'beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, *i.e.*, [that] there is no reasonable possibility that the error contributed to the verdict.'" *Armstrong*, 299 Kan. at 417 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). Certainly, credibility—the topic of prosecutor's misconduct—was a critical issue in this case and the testimony of the State's eyewitnesses was sometimes inconsistent. Nevertheless, as we have discussed, significant evidence supported the conclusion that Morris' murder was premeditated. And, while the defense attempted to disparage Fears' and Freeman's identification of Knox, other evidence corroborated their testimony. Notably, officers found a weapon involved in the murder in Knox's constructive possession. In addition, although there are reasons to suspect Freeman's testimony, especially after he struck a favorable plea deal, Knox's threatening phone call was revealed to Freeman's probation officer at a time when Freeman refused to cooperate in the investigation or to be a "snitch." Further, Fears' mother also identified Knox as a shooter. Finally, though improperly worded, the statements were made in the context of appropriate and correctly stated arguments thereby diluting their potentially prejudicial nature.

Examining the evidence as a whole and considering the context of the prosecutor's statements, we conclude the State has satisfied its burden of establishing beyond a reasonable doubt that the misconduct did not affect the outcome of the trial in light of the entire record.

Issue 4: *Did the district court improperly exclude evidence?*

Over defense objection, the district court granted two of the State's motions in limine. One motion resulted in an order prohibiting mention of the drugs and a rifle found inside Morris' Mustang. The other led to an order prohibiting mention of the drugs and guns found inside the residence at which Morris was parked when he was murdered. On appeal, Knox argues that the district court's exclusion of the evidence denied him his fundamental right to present his theory of defense.

4.1 *Standard of review and analytical framework*

A motion in limine is appropriate when:

> "(1) the material or evidence in question will be inadmissible at trial; and (2) the pretrial ruling is justified as opposed to ruling during trial because the mere offer or mention of the evidence during trial may cause unfair prejudice, confuse the issues, or mislead the jury; the consideration of the issue during trial might unduly interrupt and delay the trial and inconvenience the jury; or a ruling in advance of trial may limit issues and save the parties time, effort, and cost in trial preparation." *Bridges*, 297 Kan. at 995.

Here, although he briefly mentions that the evidence was not prejudicial, Knox only presents a challenge to the first part of the test—that is, to the admissibility of the evidence.

21

A multistep analysis applies when a district court determines the admissibility of evidence. These steps require a court to (1) examine the relevance, (2) consider the application of any applicable rules of evidence, and (3) weigh the probative value of the evidence against any prejudice. 297 Kan. at 995-96; see K.S.A. 60-445. As we will discuss, Knox's arguments fail at the first step of establishing relevance.

In examining relevance, courts must assess both the evidence's materiality and its probative nature. 297 Kan. at 995-96 (citing K.S.A. 60-401[b]; *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 [2010]). An appellate court reviews a district court's determination regarding the materiality of evidence—its tendency "to establish a fact that is at issue and significant under the substantive law of the case"—de novo. The appellate court reviews the probative nature of evidence—the "logical connection between the asserted facts and the inferences they are intended to establish"—for an abuse of discretion. *Bridges*, 297 Kan. 989, Syl. ¶¶ 2, 5.

### 4.2 *The guns and drugs lacked relevance*

Applying these standards first to the guns and drugs found in the house, Knox argues this evidence was relevant to his defense as tending to show that someone else, perhaps a rival drug dealer, was responsible for murdering Morris. Before the district court, Knox argued that the evidence was relevant because someone from inside the house could have shot Morris and most people would know that drug houses are inherently dangerous. The point of both arguments is to focus guilt on a third party.

Yet, evidence of a third party's motive, on its own, will be excluded for relevance where nothing else connects the third party to the crime. See *State v. Carr*, 300 Kan. 1, 197-203, 331 P.3d 544 (2014). And nothing in this case connects a third party to the crime. The simple presence of guns and drugs in a house that Morris never had a chance

to enter does not lead to an inference that someone else was involved in Morris' murder. Witnesses saw two or three men walk towards Morris' Mustang, shoot Morris, and then leave in vehicles. No evidence suggested the involvement of anyone other than Knox and his companions; nothing implicated anyone who entered or exited the house. Nor was there any suggestion that Morris' murder had anything to do with the drugs and guns found in the house. Theoretically, a house with drugs and guns can be a dangerous place, but that alone has no tendency to show that an unidentified and unseen person from the house or an unidentified rival drug dealer killed Morris.

As to the district court's ruling excluding evidence that Morris had a rifle stashed in the Mustang between the passenger seat and the center console, Knox claims had the jury known about the rifle, it would have more likely believed Fears' prior testimony that Morris was armed with a handgun when he died. Then it would have more likely convicted Knox of reckless second-degree murder. But Knox fails to explain a logical connection—any tendency in reason—between the jury believing Fears' prior testimony and its determining that Knox's killing of Morris was reckless. If anything, believing that Morris had a gun raises an inference that Knox intended to kill Morris before Morris could shoot Knox. This might be another piece of evidence Knox could point to in asking the district court to instruct on self-defense, but it would not overcome the legal impediment to that instruction; even under that scenario, Knox and his companions were the aggressors who provoked the shooting.

Because the guns and drugs in both the house and Morris' Mustang were not material and probative to whether Knox murdered Morris, the district court did not err in excluding the evidence. Knox's right to present his defense was not violated.

23

Issue 5: *Did the district court err in limiting Knox's cross-examination of Fears?*

At trial, Fears testified that she did not want to be a witness, did not cooperate with police, and did not testify voluntarily. On cross-examination, she reaffirmed that she did not want to be involved in the case. Defense counsel followed with, "Aren't you, in fact, a witness in another case that—." At that point, the State objected for relevance. In a colloquy at the bench, defense counsel argued that pointing out Fears' involvement in another case would impeach her testimony that her involvement in Knox's case was "not cool in her life and she doesn't have time to be involved in this sort of thing." On appeal, Knox argues Fears' involvement in the other case would show that Fears' motivation for testifying went beyond the simple fact that she had witnessed Morris' murder.

From the arguments, it appears that Fears was somehow assisting, presumably as a fact witness, in another case. (Defense counsel told the district court, "It's my understanding that she's claiming to be a fact witness in [the other] case as well.") Yet, the sole fact that Fears assisted, somehow and in some way, in another case has no bearing on her credibility in this case without some understanding of why she assisted in the other case. Two examples illustrate the point. On the one hand, perhaps Fears willingly worked with the prosecution in the other case, just to be helpful—that would be impeaching. On the other hand, perhaps she witnessed another crime and was again dragged into criminal proceedings reluctantly—that would serve to corroborate her testimony that she was "frustrated," did not want anything to do with Knox's case, and did not have time for it.

In other words, Knox may have a valid point that he should have been permitted to cross-examine Fears about her motivation for testifying, but to make that determination we need to know more about Fears' involvement in the other cases. Yet, the record on appeal does not reflect any details that would shed light on her motivation. As the party

24

seeking to admit evidence of Fears' involvement in the other case, Knox had the burden to ensure the record was adequate to make the determination. To meet that burden, he needed to proffer some details about that involvement. See *State v. Evans*, 275 Kan. 95, 99, 62 P.3d 220 (2003). Importantly, the "[f]ailure to make a proffer of excluded evidence precludes appellate review because there is no basis to consider whether the trial court abused its discretion." 275 Kan. at 100.

Without an adequate proffer regarding the details of Fears' involvement in the other case, this court has no way to assess the impeachment value of the evidence and no way to determine whether the district court abused its discretion. Consequently, this issue is not preserved and is unreviewable. See *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 274-75, 225 P.3d 707 (2010) (citing *Evans*, 275 Kan. at 99-100).

Issue 6:  *Did cumulative errors deny Knox a fair trial?*

Knox argues that multiple errors substantially prejudiced him and denied him a fair trial. There were two types of potential errors in this case:  (1) the presumed but undecided error in the district court failing to provide a jury instruction on second-degree intentional murder, and (2) the prosecutor's misconduct. Considering those errors, we must exercise unlimited review over the totality of the circumstances in this case and determine whether the cumulative effect of the multiple errors substantially prejudiced Knox so as to deny him a fair trial. See *State v. Backus*, 295 Kan. 1003, 1016-17, 287 P.3d 894 (2012).

Actually, there were several instances of prosecutorial misconduct. Nevertheless, as we previously discussed, we are satisfied the State met the beyond-a-reasonable-doubt standard of *Chapman*, 386 U.S. at 24, in establishing that the prosecutorial misconduct

25

did not impact the jury's verdict. Because the *Chapman* standard applies to that issue, the State—as the party benefitting from the error—must also establish that the cumulative error is harmless beyond a reasonable doubt. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). We must now consider the prosecutorial misconduct together with the presumed error in failing to instruct on second-degree intentional murder.

Given the strong evidence of premeditation in this case, the omission of the second-degree intentional murder instruction was a minor error that adds little overall to the prejudicial nature of the errors in this case. Even considered together, we are satisfied beyond a reasonable doubt that the errors did not impact the jury's verdict. Although Knox did not benefit from a perfect trial, due process does not require perfection, only fairness. See *State v. Todd*, 299 Kan. 263, 287, 323 P.3d 829, *cert. denied* 135 S. Ct. 460 (2014). Knox received a fair trial.

Affirmed.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  Senior Judge Malone was appointed to hear case No. 104,266 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.