IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,277

STATE OF KANSAS,
*Appellee*,

v.

OSI BISA MCBRIDE,
*Appellant.*

SYLLABUS BY THE COURT

1.

When reviewing a Court of Appeals decision, if the Supreme Court does not limit the questions on review, those questions will include all those properly before the Court of Appeals that the petition for review or cross-petition allege were decided erroneously. If the State does not cross-petition for review of a Court of Appeals holding that prosecutorial error occurred in a criminal case, the Supreme Court will not consider whether that holding was erroneous when reviewing the appeal.

2.

Appellate courts employ a two-step analysis to evaluate claims of reversible prosecutorial error. These two steps are simply described as error and prejudice.

3.

To determine whether prosecutorial error occurred, an appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded to prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the

1

appellate court next must determine if the error prejudiced the defendant's due process rights to a fair trial.

4.

In evaluating the prejudice step in the two-step analysis for reversible prosecutorial error, an appellate court will exclusively apply the traditional constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under that inquiry, prosecutorial error was harmless if the State proves beyond a reasonable doubt the error did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict.

Review of the judgment of the Court of Appeals in an unpublished opinion filed January 15, 2016. Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed December 1, 2017. Judgment of the Court of Appeals affirming the district court is reversed on the issue subject to review. Judgment of the district court is reversed, and case is remanded.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, argued the cause, and *Kimberly Streit Vogelsberg*, of the same office, was on the brief for appellant.

*Jodi E. Litfin*, deputy district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Osi Bisa McBride appeals his kidnapping conviction, claiming the prosecutor violated his rights to a fair trial by making improper remarks to the jury during closing arguments. A Court of Appeals panel agreed prosecutorial error occurred when the prosecutor asserted the alleged victim deserved consideration similar to the presumption of innocence constitutionally recognized for criminal defendants, but determined this error was harmless and affirmed the conviction. See *State v. McBride*,

No. 112,277, 2016 WL 199062 (Kan. App. 2016) (unpublished opinion). On review, we disagree with the harmlessness determination and reverse the kidnapping conviction. We remand the case to the district court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

The State charged McBride with one count of rape, one count of aggravated kidnapping, and two counts of criminal sodomy. These charges stemmed from a November 7, 2011, incident with a woman, C.C., with whom McBride had an intermittent romantic relationship dating back to early 2010. C.C. reported McBride raped and sodomized her at his mother's house, where he lived. McBride stood trial on these charges twice.

The first trial occurred in August 2013. The jury could not reach a unanimous decision on any counts, so the district court declared a mistrial. At the second trial in November 2013, a jury convicted McBride only on a lesser included charge of kidnapping under K.S.A. 2016 Supp. 21-5408(a)(3). The court sentenced him to 216 months in prison, followed by 36 months of postrelease supervision.

On appeal, McBride made two arguments. First, he asserted the prosecutor violated his rights to a fair trial during closing arguments by: (1) improperly commenting on C.C.'s credibility; (2) implying McBride had a burden of proof to attack the State's story and present a defense; (3) misstating the case's facts; and (4) disparaging defense counsel. Second, he contended the trial court violated his Sixth and Fourteenth Amendment rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), by relying on his criminal history at sentencing without asking a jury to find it beyond a reasonable doubt.

3

A Court of Appeals panel affirmed the conviction and sentence. *McBride*, 2016 WL 199062, at *1. It agreed the prosecutor improperly commented on C.C.'s credibility when he referred to C.C. and then asked the jury, "'[D]oesn't she deserve a certain presumption as well?'" 2016 WL 199062, at *2. But the panel concluded this error was not gross and flagrant, not motivated by the prosecutor's ill will, and harmless because there was overwhelming evidence against McBride. 2016 WL 199062, at *7-8. The panel determined the remaining prosecutorial statements in dispute were within the wide latitude afforded prosecutors in criminal cases and not error. 2016 WL 199062, at *3-7.

The panel also rejected the *Apprendi* claim, relying on *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002) (use of prior convictions to determine sentence does not trigger *Apprendi* protections). *McBride*, 2016 WL 199062, at *9.

McBride petitioned this court for review only on the prosecutorial error issue, which we granted. Jurisdiction is proper. K.S.A. 20-3018(b) (petition for review of Court of Appeals decision); K.S.A. 60-2101(b) (providing Supreme Court jurisdiction over cases subject to review under K.S.A. 20-3018).

The State did not cross-petition for review of the panel's determination that the prosecutor misstated the law about C.C.'s deserving consideration similar to the defendant's presumption of innocence, so that much is settled in McBride's favor. See *State v. Rosa*, 304 Kan. 429, 437, 371 P.3d 915 (2016) (only issue on review is whether error was harmless when State did not cross-petition from prosecutorial error determination by Court of Appeals); see, e.g., *State v. Keenan*, 304 Kan. 986, 992-93, 377 P.3d 439 (2016) (State cannot challenge a preservation issue on review because it did not cross-petition for review of that determination by Court of Appeals); *State v. Corey*, 304 Kan. 721, 741-42, 374 P.3d 654 (2016) (Supreme Court did not question panel's determination about defendant's absence during a critical stage of trial, noting State did

4

not cross-petition for review on that question); *State v. Williams*, 303 Kan. 750, 754, 368 P.3d 1065 (2016) (State did not cross-petition for review on Court of Appeals determination that there was insufficient evidence to establish the crime of criminal threat, so that finding was not before Supreme Court on review); *State v. Allen*, 293 Kan. 793, Syl. ¶ 2, 268 P.3d 1198 (2012) ("Under Supreme Court Rule 8.03[g][1], a party must allege that an issue was decided erroneously by the Court of Appeals in order for the issue to be properly before the Supreme Court on petition for review."). At oral argument, the State agreed the single issue on review was whether the prosecutorial error was harmless.

Because we hold that the established prosecutorial error is reversible standing alone, we make no rulings as to the remaining prosecutorial error claims. Additional facts will be detailed as necessary to complete our analysis.

STANDARD OF REVIEW

The panel released its unpublished decision in January 2016. At that time, when a criminal defendant claimed a prosecutor's act denied the defendant's due process rights to a fair trial, Kansas courts routinely referred to this as a "prosecutorial misconduct" claim. See, e.g., *State v. Barber*, 302 Kan. 367, Syl. ¶ 4, 353 P.3d 1108 (2015). The then-effective standard of review was a two-step analysis set out in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004).

Under *Tosh*, an appellate court first decided whether the prosecutor's comments were outside the wide latitude allowed in discussing evidence. 278 Kan. at 85. If they were, the court next made what was described as a "particularized harmless inquiry," assessing: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence against

5

the defendant was of such a direct and overwhelming nature that the misconduct likely had little weight in the jurors' minds. 278 Kan. at 93. None of these individually controlled, but before the third factor could ever override the first two, the appellate court had to be able to say the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), were met. 278 Kan. at 96.

But *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), which was released in September 2016, abandoned *Tosh*'s particularized harmlessness inquiry and adopted a new analytical framework for determining whether prosecutorial errors require reversal. See 305 Kan. at 107. In doing so, *Sherman* renamed these claims "'prosecutorial error,'" saving the "'prosecutorial misconduct'" label for more egregious actions. 305 Kan. at 90, 114 ("Prosecutorial acts properly categorized as 'prosecutorial misconduct' are erroneous acts done with a level of culpability that exceeds mere negligence."). *Sherman* did not disturb the preexisting standard for whether the complained of prosecutorial action was improper, i.e., the action was outside the wide latitude afforded prosecutors. 305 Kan. at 104 ("The well-developed body of caselaw defining the scope of a prosecutor's 'wide latitude' . . . will continue to inform our review of future allegations of prosecutorial error.").

Under *Sherman*:

"If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.] We continue to acknowledge that the

6

statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" 305 Kan. at 109.

The *Sherman* court further noted,

> "Multiple and varied individualized factors can and likely will affect the *Chapman* analysis in future cases. Every instance of prosecutorial error will be fact specific, and any appellate test for prejudice must likewise allow the parties the greatest possible leeway to argue the particulars of each individual case. Thus, appellate courts should resist the temptation to articulate categorical pigeonholed factors that purportedly impact whether the State has met its *Chapman* burden. Appellate courts must simply consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.*, shown that there is no reasonable possibility that the error contributed to the verdict. The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry. As has often been repeated, prejudice can exist even 'in a strong case.' *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 (1940)." 305 Kan. at 110-11.

Finally, the same standard of review applies to a prosecutorial error claim concerning closing arguments regardless of whether a defendant raised a contemporaneous objection. *State v. Pribble*, 304 Kan. 824, 831, 375 P.3d 966 (2016).

## ANALYSIS

In closing argument, the prosecutor, Assistant District Attorney Todd Hiatt, commented on C.C.'s credibility, by saying:

7

"Based on all the evidence. Right? Based on the way she reacted that afternoon, and the consistency from person to person to person, based upon her emotional state when she met with [the investigating law enforcement officer], based on her emotional state when she met with [the SANE nurse], based on her emotional state as she sat here and talked to you, the way I see it, there's two options. Right? She's either a heck of an actress and been doing it for a long time or she was raped and criminally sodomized on November 7th, 2011."

In the State's rebuttal argument, the prosecutor responded to defense counsel's closing by stating:

"The defendant sits there presumed innocent. I would submit to you that . . . [C.C.], who comes in here, deserves a little bit of consideration, too. She gets up there under oath. Right? She swore under penalty of perjury to tell you folks the truth. And as she tells you what happened, did you find anything in her story that made you think she was lying to you all? As she sat there under oath, on that stand and related to you in intimate detail that day, doesn't she deserve a certain presumption as well?"

The prosecutor went on to say,

"They got no burden. He doesn't have to prove anything to you. I mean, she can say they've proven things wrong, but that's not their burden. They don't have that. But when they try to poke holes in [C.C.'s] story, don't you want to see something that's going to back up that? I mean, if you're going to poke holes in what she has to say, then substantiate it, let's see it. You think that she's going to talk to this guy, or talk to all these people about this guy raping her for 60 bucks? Are you serious?"

The panel determined the prosecutor misstated the law by asserting C.C.'s credibility deserved consideration similar to McBride's presumption of innocence because she testified under oath. *McBride*, 2016 WL 199062, at *4 ("The presumption enjoyed by McBride was different—not a presumption regarding the truthfulness or

8

credibility of witnesses, but of his personal innocence until proven guilty beyond a reasonable doubt."). But the panel held this error did not deny McBride a fair trial. 2016 WL 199062, at *9.

Using the *Tosh* paradigm, the panel concluded the error was not gross and flagrant, not motivated by the prosecutor's ill will, and there was overwhelming evidence against the defendant. 2016 WL 199062, at *7-8. The panel characterized the presumption comment as vague concerning what consideration or presumption the jury should give C.C. and said this ambiguity mitigated the impropriety. 2016 WL 199062, at *7.

In discussing the evidence against McBride, the panel noted the jury acquitted him of several more serious felonies and only convicted him of the lesser included crime of kidnapping, which the panel said suggested the "improper argument did not result in the jury wholly embracing the truthfulness of [C.C.'s] testimony." 2016 WL 199062, at *8. Importantly, it concluded:

> "[T]he only issue with respect to kidnapping was whether [C.C.] was at the house by force or threat. Given that [C.C.] had dressed for work and was being driven to work [by McBride], there was no explanation for [C.C.'s] presence with McBride at the house other than, as [C.C.] testified, she was forced into the residence." 2016 WL 199062, at *8.

Finally, the panel addressed McBride's argument that because his first trial ended in a mistrial on all charges it meant the prosecutor's "'misconduct in this trial swayed the jury from a mistrial on all counts to a conviction of kidnapping.'" 2016 WL 199062, at *8. The panel labeled this argument speculative, noting the improper comment was brief, vague, and merely a fleeting aspect of the entire trial. It also concluded the jury

9

instructions, which stated that counsel's statements were not evidence, would have mitigated the error's impact. And the panel observed there was additional evidence admitted in the second trial, including photographs and law enforcement testimony that matched C.C.'s descriptions about the house where the assault was alleged to have occurred. The panel then concluded, "Given the difference in the presentation of evidence during both trials, McBride's claim that [the prosecutor's] errant comment caused his conviction is not convincing." 2016 WL 199062, at *9.

As noted, because the State did not cross-petition for review of the panel's holding that the prosecutor strayed outside the wide latitude afforded to prosecutors by misstating the law to bolster C.C.'s credibility, we accept that holding in McBride's favor. Accordingly, we move to the harmlessness inquiry. To do so, we must first review the trial testimony and other evidence relevant to the kidnapping charge.

*Statement of Additional Facts*

On November 6, 2011, the day before the reported kidnapping, McBride brought some food for C.C. and her children and grandchildren. They ate dinner and watched a movie at her residence in Topeka. He gave her $60 to pay a water bill. They spent the night together and had consensual sex.

The next morning, C.C. was to attend a job training. Normally, she took a bus, but on this day McBride offered to give her a ride.

As C.C. was getting dressed, she saw a "hickey on [her] neck," which she described as "not big and huge, but very noticeable." Since it could not be covered with makeup, she changed into a turtleneck. At that moment, she testified, McBride became

10

angry, accusing her of planning to meet somebody. As they left the house, McBride was still "ranting and raving" about the change of clothes.

C.C. had her book bag containing various personal items including the $60 and her cell phone. When the couple got into the car, he demanded the money back. C.C. told him her daughter, who was asleep in the house, had the money. C.C. said she did not want to wake her up. Both continued to argue inside the car for about 20 to 25 minutes. When C.C. tried to leave with her bag, McBride stopped her by pulling it toward himself.

Eventually, McBride began driving and C.C thought he was taking her to the training, but instead he drove to his mother's house where he and his sister lived. C.C had never been there, did not know who lived there, and had no idea why McBride took her there. He pulled into the garage at the back of the house. C.C. was upset and refused to get out.

C.C. testified McBride opened her door and then "snatched [her] by [her] arm . . . and pulled her out of the car." He then "walked" her to the house and took her through the front door. While doing so, he did not hit or shove her, but C.C. said she did not feel free to leave. Once inside, McBride pushed her onto a couch and "said, 'stay here.'" She described his behavior toward her as "extreme" and said he had never acted that forcefully with her. She said she was looking around to find a way to get out of the house. While there, C.C. went to the bathroom twice. Each time, McBride watched her. He also walked with her to the kitchen sink when she went to get water.

She testified McBride said, "'What the hell is in this bag that's so important to you?'" He snatched the bag and dumped everything out until he discovered the money. McBride said, "'You lying bitch.'"

11

At that time, McBride also went through the text messages and call history on C.C.'s phone. He called C.C. a "liar," a "cheater," a "bitch," and a "whore." McBride called the numbers of males listed in her phone. He called Trevin James, Clifton Steward, Curtis Pitts, and "Willie." According to C.C., McBride was "very angry . . . and yell[ed] at them on the phone." He asked each man, "Are you fucking my girl?" and said, "Stay away from my girl."

But Steward testified McBride's voice on the phone was calm and fine although McBride might have used the word "fucking." And James testified he did not feel McBride was a threat to him and felt McBride was "just really trying to figure out why [his] number was in [C.C.]'s cell phone."

Later, McBride gave C.C. her phone back but she never tried to call 9-1-1 or anyone else. She said, "I wasn't real for sure where I was and I couldn't tell them how to get to me." Either before or after the phone calls, McBride hit her in the head or face with his hand. She testified at that point she was not "in particular fear for [her] life." McBride said, "I'm just done with you." She retrieved her personal items. She also testified, once he said he was done, she was thinking he was going to take her home or to the training. C.C. testified McBride then raped and sodomized her in a bedroom.

Later that morning, McBride's sister came home and took C.C. back to her house. McBride rode with them. McBride's sister testified C.C. did not talk to her but said "she just looked normal." Around noon, C.C. reported the crimes to law enforcement. Officer Chris Hamilton came to her home. Officer Hamilton testified she was visibly upset, crying, and shaking as she recounted the events.

Officer Hamilton took C.C. to the hospital where Joy Thomas, a sexual assault nurse examiner, interviewed her and conducted a head-to-toe exam. Thomas testified she

12

did not find any external or internal injury or bruise on C.C.'s body. But Thomas added that absence of injury was not unusual and did not indicate anything. Thomas did not note that C.C. had a hickey on her neck and found no evidence of injury despite C.C.'s statement that McBride hit her head. After C.C. left the hospital, McBride tried calling her at least 25 times.

Two years after the incident, and shortly before the second trial, C.C. contacted McBride asking for money to pay an electric bill. He said he would do that if she did not testify against him. She refused "because [she] had been subpoenaed and . . . could go to jail."

*The State Fails to Meet Its Harmless Error Burden*

"The right to a fair trial is a fundamental liberty secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Sherman*, 305 Kan. 88, Syl. ¶ 1. We must decide whether the prosecutorial error prejudiced McBride's due process rights to a fair trial. As discussed, in evaluating prejudice the court uses the *Chapman* harmless error test. 305 Kan. at 109. Under that test, the State's burden is to demonstrate beyond a reasonable doubt that the error did not affect the trial's outcome in light of the entire record, i.e., "there is no reasonable possibility that the error contributed to the verdict." 305 Kan. 88, Syl. ¶ 8.

When conducting the *Chapman* analysis, an appellate court must consider "any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden." 305 Kan. at 110. *Sherman* advises that the evidence's strength against the defendant "may secondarily impact" this analysis, and the court must focus on the error's impact on the verdict as the primary inquiry because "prejudice can exist even 'in a strong case.'" 305 Kan. at 111.

13

We must keep in mind that the jury convicted McBride only on the lesser included kidnapping charge under K.S.A. 2016 Supp. 21-5408(a)(3). And its elements are central to the harmlessness analysis. The statute provides, "(a) Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person . . . (3) to inflict bodily injury or to terrorize the victim or another." K.S.A. 2016 Supp. 21-5408(a)(3).

The State argues the overwhelming evidence at trial presents no likelihood the verdict would have been different absent the prosecutor's error. The "overwhelming evidence" it refers to was C.C.'s testimony that (1) McBride did not let her get out of the car without leaving her book bag behind; (2) when she asked him when they could leave for her training, he answered "'as soon as I get my money, I'll take you'"; (3) he took her to his mother's house instead of the training; (4) she did not feel free to leave; (5) inside the house, he pushed her onto the couch and said "'stay here'"; (6) he yelled at her when he found his money in her bag; (7) he yelled at her friends on the phone; and (8) when he gave her phone back she did not call the police because she did not know where she was. This underscores how the State's case hinged on C.C.'s credibility for each point.

Although the panel properly stated the constitutional harmless error test, we disagree with its analysis and conclusions. We note first we are not persuaded the additional evidence at the second trial strengthened the State's case as much as the panel believed. Based on our review, this additional evidence did not add anything to support the kidnapping charge's critical element that C.C.'s presence in the house was attributable to force, threat, or deception by McBride.

In the second trial, there were two additional State witnesses:  a YMCA program director and a Topeka Public School District employee in human resources. There was

14

one defense witness: McBride's sister. The first trial's witnesses testified essentially the same as they did in the second, except C.C. said in the second trial that "[w]hen we left my house, I didn't know where I was being taken." But at the first trial, she testified after they left her house, while driving, "at some point" she heard they were going to McBride's mother's house, so she knew where he was taking her. The YMCA program director testified she did not personally receive C.C.'s telephone call, but YMCA records indicated C.C. contacted the agency on November 7, 2011. The YMCA hot line did not record her call, and there were no written notes. The school district employee testified she gave the police C.C.'s attendance record for November 7, 2011, which showed her absent that day.

Exhibits at the second trial were: (1) a city map; (2) a picture showing Washburn Tech where C.C. was to have had the training; (3) a picture of the door going into the house and the couch; (4) a picture of the door and plants in the background in front of the window; (5) another door picture; (6) several bedroom pictures; (7) a printout showing C.C.'s absence; (8) several house pictures from different angles; (9) black shirts seized by the police; (10) a bed comforter and another shirt seized by the police; and (11) a property receipt for the sexual assault kit taken from the hospital. None of these add to the force, threat, or deception element.

After careful review, although it is quantitatively obvious the State introduced more evidence at the second trial, none can be described as direct and overwhelming concerning the critical element for McBride's kidnapping charge: McBride's alleged use of force or threat when taking or confining C.C. in the house. See K.S.A. 2016 Supp. 21-5408(a)(3). In other words, at both trials C.C.'s uncorroborated testimony was the only evidence about this, so the jury's credibility determination about what she was saying was key—and that is what the prosecutor improperly tried to bolster by claiming C.C. deserved a credibility presumption akin to McBride's presumption of innocence.

15

We are also unpersuaded by the Court of Appeals' rationale that "there was no explanation for [C.C.'s] presence with McBride at the house other than, as [she] testified, she was forced into the residence." Having reviewed the record, it is equally plausible, for example, she remained there because she wanted or needed someone to give her a ride.

As noted in *Sherman*, "prejudice can exist even 'in a strong case.'" *Sherman*, 305 Kan. at 111. But this was not a strong case due to the lack of evidence corroborating C.C.'s testimony. And the prosecutor's "presumption" comment reasonably could have caused the jury to accept her testimony in the absence of anything else to support it. We are also unconvinced the jury would have understood the instructions, which emphasized the impact of the defendant's constitutional presumption of innocence, to preclude the evidentiary presumption for which the prosecutor advocated, i.e., "doesn't she deserve a certain presumption as well?" Finally, we note the jury in the first trial did not reach a unanimous verdict on any of the counts after hearing the same evidence as to force, threat, or deception, as the second jury.

Under these circumstances, we hold the State did not meet its burden of showing there is no reasonable possibility the prosecutor's error contributed to the guilty verdict. See *State v. Akins*, 298 Kan. 592, 613, 315 P.3d 868 (2014) (holding no physical evidence made witnesses' credibility of paramount importance, and concluding the prosecutor's comments were reversible error); *State v. Pabst*, 268 Kan. 501, 511-12, 996 P.2d 321 (2000) (noting "the jury . . . might have decided Pabst was guilty because the prosecutor told it Pabst was lying" and holding, because there was no overwhelming evidence, it required reversal). But see *State v. Knox*, 301 Kan. 671, 687, 347 P.3d 656 (2015) (holding prosecutorial error was harmless since significant evidence, including testimony by several independent witnesses and physical evidence, supported jury's verdict).

To be sure, it is rare for this court to reverse a criminal conviction due to a prosecutor's improper commentary during closing arguments. But as we noted in *Sherman*, these cases obligate the judiciary to "focus on and vindicate the dual interests of justice that are present in a criminal case—*viz*., the rights of the defendant to receive a fair trial and society's need to punish and deter crime." *Sherman*, 305 Kan. at 93. In this instance, we are obligated to vindicate McBride's right to a fair trial.

We reverse McBride's kidnapping conviction and remand to the district court for further proceedings.